THE STATE OF UTAH, Respondent, v. CHARLES
BOTHA, Appellant.

No. 1450.   (75 Pac. 731.)

1.  Homicide:  Examination of Witnesses:  Cross-Examination.

Revised Statutes 1898, section 4168, provides that a homicide
is justifiable when committed in a heat of passion caused
by an attempt of deceased to defile the wife of accused,
or when the defilement has been committed.  On a prosecution for murder it appeared that the wife of accused had
left his house, and gone to that of a neighbor, and that defendant followed her, and killed the neighbor and the wife,
and the defense was that the homicide was justifiable under the statute.  On cross-examination of a witness by defendant, witness was asked whether she had heard the deceased wife talk about anything that referred to her leaving home, and answered that the wife had said she was
afraid of defendant, and afraid that he would kill her. The
State subsequently asked witness whether she ever heard
the deceased wife say anything about defendant having
said that he had killed people, to which witness said that
the wife had said defendant told her he had killed two
men.  Held, that the answer was not objectionable, since
the subject had been introduced by testimony drawn out
by defendant, notwithstanding that the answer of the witness disclosed a fact tending to show that the conduct of
the neighbor might have been induced through sympathy,
rather than any improper relation with the deceased wife.[1]

[1] State v. Mortensen, 26 Utah 312, 73 Pac. 562.

**2.   Same: Evidence: Exceptions.**

An objection that the answer of a witness was a mere opinion can not be considered on appeal, where no objection was made or exception taken on trial, nor any motion made to strike out.

**3.   Same.**

The propriety of a question put to a witness can not be reviewed on appeal in the absence of any exception or objection.

**4.   Same: Defenses: Defilement of Female: Sudden Passion: Instructions.**

An instruction that if the jury believed that the deceased neighbor had sexual intercourse with the wife of defendant, or attempted to have such intercourse with her, and that defendant killed the neighbor in a sudden heat of passion caused by such intercourse, the jury should find defendant not guilty, was more favorable than defendant was entitled to.

**5.   Same: Statutory Construction.**

Revised Statutes 1898, section 4168, provides that homicide is justifiable when committed in a sudden heat of passion caused by the attempt by deceased to defile the wife or other female relative of accused, or when the defilement has actually been committed. *Held*, that the statute only applies to a killing done in a sudden heat of passion, and does not shield one who, because of mere rumors or appearances, has sought out another, and deliberately taken his life.[2]

**6.   Same: Instructions.**

In a prosecution for murder it appeared that accused and his wife lived in a lonely place, that his treatment of her was cruel, and that he had informed her that he had previously killed a couple of men, and that shortly after that, she went to the house of another man, a neighbor. There was no evidence of any improper relations between such neighbor and the wife, the only evidence in such direction being the statement of defendant that he had once seen the neighbor have his arm around the wife's waist. Defendant, on finding his wife gone, followed her to the neighbor's house, and shot the neighbor and the wife. It appeared that after the wife was shot she said that the neighbor was not to blame, and that, if any one was at fault, it was herself. *Held*, that under the evidence it was proper to refuse to charge under Revised Statutes 1898, section 4168, that ac-

[2] People v. Halliday, 5 Utah 467.

cused should be acquitted if the jury believed that he had at the time of the killing sufficient grounds for believing that the killing was justifiable.

**7.  Same: Defense: Accident.**
It appearing, together with the other evidence, that after the shooting defendant examined the wife's wound, and pronounced it a "good job," and stated that he believed she would die, and that he had "fixed her," a claim that the killing was an accident was untenable.

(Decided February 18, 1904.)

Appeal from the Seventh District Court, San Juan County.—*Hon. Jacob Johnson,* Judge.

The defendant was convicted of murder in the first degree and appealed.

AFFIRMED.

*Will F. Wanless, Esq.,* and *M. M. Warner, Esq.,* for appellant.

*Hon. M. A. Breeden,* Attorney-General, and *Hon. W. R. White,* Deputy Attorney-General, for the State.

STATEMENT OF FACTS.

The defendant was prosecuted for the murder of William Tibbitts, and convicted of that crime.  From the evidence it appears, among other things, that the prisoner and the deceased were living in the La Sal mountains, as settlers, with houses about 15 miles apart. Both were married, but the wife of the deceased, at the time of and for some time previous to the shooting, was not living with him at his home.  The shooting was witnessed by one Corydon Rose, who resided at the house of the deceased.  Before the fatal occurrence, the prisoner occasionally worked for Tibbitts, and Mrs. Botha the prisoner's wife, who was but 16 or 17 years of age, did some cooking for the family of the deceased, and some washing for him.  When the prisoner was working for him, he and his wife generally slept at the de-

ceased's house, and sometimes when the prisoner was away his wife slept there. At such times, it seems, Rose slept in the sitting room, Tibbitts in a room connecting with the sitting room by a door on the north side, and the prisoner and his wife occupied and slept in a room connecting with the sitting room by a door on the west side. The prisoner, according to his testimony, became suspicious of improper conduct between his wife and the deceased. He testified that on one occasion he saw the deceased have his arm around her, and upon upbraiding him for it the prisoner says he promised to let her alone. The witness Rose testified he never saw anything out of the way between the deceased and Mrs. Botha, and never saw him go into her bedroom while she was in it. No witness, except the prisoner, testified to any undue familiarity between the deceased and Mrs. Botha. Botha was poor, and did not provide a comfortable home for his wife. It appears they had no near neighbors; that she became dissatisfied with her home; and that sometimes she went away, and then her husband would induce her to return home again. There is testimony to the effect that she was afraid that her husband would kill her; that he had told her that he had killed two men in Germany. It seems the wife's appearance and situation were the common talk of the neighborhood. Her condition was such that she needed help, and on account of her youth the neighbors seemed to sympathize with her. A petition was being circulated among the people to raise money to send her to her folks. Her mother lived in South Dakota, and her sister in Colorado. Mrs. Botha had left her husband, and, as appears, was on her way to her sister, when she was killed by her husband.

The witness Patterson, one of the nearest neighbors although about six miles distant, described the Botha home as a "half dug out, dug in the bank, and then walled up in front with timbers," with one door and one window. They had no stove, simply a fireplace, and the room was very scantily furnished, having a "bunk" for

a bedstead. It seems the defendant would go away for several days at a time, and leave his wife at home alone. She appeared lonesome, and went to neighbors for company. This was so about the 17th of March, 1902. On that day, her husband being away, she went to the home of the witness Patterson, stayed there until the following day, when she begged the witness to get her trunk from the defendant's house and take it to a certain mail station, and then went with deceased to his home. Having been informed by the witness Patterson that he would not take her trunk to the mail station unless she would get it out of their house, she and the deceased, on the next morning, March 19th, the day of the homicide, went to the prisoner's house, took her effects, and returned to the home of the deceased; Mrs. Botha intended thence to go to her sister in Colorado. The defendant returned home, and, finding that his wife had gone, started to go to a neighbor, and on the way (so he testified) was informed of her whereabouts. He then went to a neighbor, borrowed a gun, and started from Mr. Patterson's house, after having eaten supper there, for the Tibbitts home, about eight miles distant. Arriving at the latter place, he shot and killed first his wife and then Tibbitts. Having accomplished his purpose, he returned, and arrived at the Patterson place about 12 o'clock the same night. Concerning his appearance, and what the prisoner said before and after the fatal shooting, the witness Patterson in part said: "He asked me for a gun to go up to Mr. Tibbitts' for his wife, and I refused to let him have a gun. He looked like he was in an angry passion. I didn't like to let him have a gun, for it appeared he was going up there to make mischief. He then turned and walked off right down past my house. We worked a little while longer and went to our suppers. We just had supper over, when Mr. Botha came back. He said to me when he came up, 'George, have you got a biscuit I can get to eat?' I said, 'Charley, come in and eat your supper.' He had a 44 Winchester gun with him. He ate his sup-

per eagerly, like he was mad. He did not use any knife or fork. I said, 'Charley, you stay here, and let me go up to Tibbitts and talk for you.' He said, 'No, no son of a b—— can go up there but me.' He says, 'What business is it to you?' He said, 'Have you got a wiping stick that I can clean my gun?' I said, 'Yes.' I gave him one, and he wiped the gun. He said, 'I will settle this business,'' and then started off. It is seven or eight miles from my house to Tibbitts'. I saw him after that on the same night about twelve o'clock. He came back on horseback; came in and asked for some coffee. 'Well,' he said, 'I have done the work for them folks up there. Now I don't know whether to give myself up or whether to travel;' and I said to Mr. Botha, 'What, you didn't kill the little woman?' And he said to me, 'Yes, she was the first one to get it.' I said, 'That looks pretty hard, Charley.' He says: 'It does not bother me. I could do it right over again. I left May, but I guess she has gone to heaven by this time. I fixed them so they could go off to heaven together.' He told me how he shot Tibbitts through the wall of the pantry.''

Corydon Rose, the only witness, except the prisoner, who was present at the shooting testified respecting the occurrence as follows: ''I was there on the day of the killing. I witnessed the shooting. The first I saw of Charlie, the defendant, on the day of the killing, he came into the house, and went to shooting. I was washing dishes at the time. I should judge that it was about eight o'clock when I saw Charlie—I mean the defendant. Charlie came into the kitchen door, right in from the porch. I was standing in the kitchen, washing dishes. Tibbitts stood right near me. Mrs. Botha was in the sitting room, out of my sight. When Botha came in, he had a gun in his hand, all ready for use. He wanted to know of Tibbitts what he was stealing his wife for, or something like that. Tibbitts said that he had not stolen his wife. Then he told him to give an account of himself. Tibbitts undertook to say some-

thing, and then Mrs. Botha stepped out here in sight, and a shot was fired, and she came running towards me, and said she was shot. I did not see her when the shot was fired. I was not looking at her, because Charlie was pointing his gun at Bill. Mrs. Botha was leaning on the table, and she begged of Charlie not to kill Tibbitts. She said she was only in the fault, and if there was any fault it was on her side. At that Tibbitts ran into the pantry. Charlie kept saying for Bill to come out and explain, and Bill says, 'If I come out, you will shoot me.' 'No,' Charlie says, 'I won't.' Charlie shot through the partition four times I think. He never hit Tibbitts until the last shot, then Tibbitts fell.'' After he was shot, Charlie wanted to see the wound, and I pulled the clothes around the best I could, and he saw the wound, and Bill was begging to be carried out onto the step, and I told Charlie I couldn't do it. I was shaking so I couldn't. Charlie said, 'I will carry him out,' and he took him and dragged him out onto the porch. He said he had got so as he could fix him, or something like that. Mr. Botha said something about it being a good job, and he would die. He said he had done a good job. He made an examination of the wound of Mrs. Botha before Bill was taken out. He said he believed they would die from the wounds. He went out to the stable, and got a horse, and went after we had got Bill out onto the porch.''

Under this and other evidence of a similar character the jury convicted the defendant of murder in the first degree, and the court sentenced him to be executed. He thereupon appealed to this court, and assigned numerous errors.

BARTCH, J., having made a statement of the facts as above, delivered the opinion of the court.

The first assignment of error which requires consideration relates to the admission of evidence. The court permitted, over the objection of the defense that it was leading, and not proper, the witness Rose, who was present at the commission of the

crime charged, to answer a question propounded by the
prosecution, as follows: ''Did you ever hear Mrs.
Botha give reasons for saying that she was afraid of
Botha? As to what she had heard him say about killing
people, or anything of that nature.'' The witness an-
swered: ''I heard her say that Charlie had told her
that he had killed two men in Germany.'' The objec-
tion urged here cannot avail the appellant, under the
circumstances disclosed by the transcript of the record.
The defense itself, on cross-examination, laid the foun-
dation for the objectionable question by interrogating
the witness and receiving answers, as follows: ''Did
you hear Mrs. Botha talk about anything that referred
to her leaving home? A. No, nothing more than I
heard her say she was afraid to stay at her home. Q.
Did she say why? A. Why she said she was afraid
of Mr. Botha. Q. Did she say why she was afraid
of him? A. Well, no; I don't know as she did. Q.
Do you know whether she did or not, in your presence?
A. No, I don't think she said really why. She was
afraid he would kill her was all.'' After the defense
had thus introduced the subject, it was not improper
for the court to permit the prosecution to pursue it in
the same line, and ascertain the real reason why she
was afraid of her husband. The witness evidently hav-
ing forgotten one of the main reasons included within
the scope of the questions propounded by the defense,
it was within the discretion of the court to permit the
prosecution, by a leading question, to revive the recol-
lection of the witness, and thus ascertain the exact rea-
son or cause of her fear. Underhill, Crim. Ev. sec.
213. The defense having gone into the subject, the
prosecution had a right to have the witness explain fully
what Mrs. Botha stated as her reasons for leaving her
husband's home, in explanation of the conduct and act-
ions of both herself and Mr. Tibbitts, and as indicating
that she had not left home and was not stopping at the
latter's place on the fatal night because of undue famil-
iarity with him, but because she was afraid of her hus-

band, and was simply stopping there on that occasion on her way to her sister in Colorado; that she was on her way to her sister appearing from other evidence.

It is true that the answer of the witness to the disputed question has some significance in this case. It tends to show that the actions and conduct of Mr. Tibbitts—who, it appears, was present when she related her fears because of her husband—towards Mrs. Botha may have been induced through sympathy, rather than improper relations or motives. It also discloses the fact that the prisoner had himself created a fear in the breast of his wife that he would kill her, and that, under existing circumstances, he had no right to assume on the fatal night, as by his testimony he affects to have assumed, that undue familiarity existed between his victims. Such testimony tends to rebut the idea that he was acting under an uncontrollable impulse in the heat of passion. If, therefore, the prosecution had elicited the evidence in dispute in the examination of the witness in chief, before the defense had introduced the subject, we might hesitate to hold, even under the circumstances of this case, that the question was improper. Where, however, the defendant in a criminal action, through his counsel, upon cross-examination, sees fit to open up an avenue for questions, which, otherwise, it would be improper for the prosecution to propound, he must be content to take the consequences which legitimately flow from his indiscretion. Thereafter he will not be heard to complain of that for which he was himself responsible. State v. Mortensen, 26 Utah 312, 73 Pac. 562.

The appellant also complains of the action of the court respecting some of the testimony of the witness Patterson. In answer to a question by the prosecution he testified: "He (the defendant) asked me for a gun to go up to Mr. Tibbitts' for his wife, and I refused to let him have a gun." He was then asked, "Why?" This was objected to, but upon what ground does not appear. The objection was overruled, and the

witness answered: ''He looked like he was in an angry passion. I didn't like to let him have a gun, for it appeared he was going up there to make mischief.'' It is insisted that the phrase ''to make mischief'' was a mere opinion of the witness; that it was error to receive such opinion to show what the intent of the defendant was on that occasion; and that it was the province of the jury to determine what the prisoner's purpose was. The reply to all this is that there was no objection made nor exception taken to the phrase, or any other portion of the answer of the witness. Nor was there any motion made to strike out. The objection thus urged must therefore fail.

For like reasons the objection now urged on behalf of the prisoner against the question propounded to the witness Stocks by the prosecution, as follows: ''While you were there, did you learn personally about any petition or subscription that was going around with reference to Mrs. Botha?'' even if it were sound, could not avail the appellant.

At the time of submitting the case to the jury, the defendant requested the court to charge, inter alia, as follows: ''The jury are instructed that, even though they should find from the evidence that the accused killed the deceased under such circumstances as would constitute a killing, murder under the ordinary conditions, it would still be the duty of the jury to acquit the accused if the jury believed from the evidence that the defendant had at the time of the said killing reasonable and sufficient grounds for believing that the said killing was justifiable, and that he acted upon that belief. And this is true even though the information upon which the accused acted was untrue, provided it was received by the accused in such a form and manner as would cause a careful and cautious man to act upon it.'' The court refused this request, and upon the subject of the justification of the killing charged the jury, among other things, that homicide was justifiable ''when committed

in a sudden heat of passion, caused by the attempt of the deceased to commit a rape upon or to defile the wife, daughter, sister, mother, or other female relative or dependent of the accused, or when the defilement had actually been committed. The defilement of a female, as meant by these instructions, is accomplished when any male person, not the husband of such female, has had sexual intercourse with such female. And the attempt to defile a female has been accomplished when such male person has attempted to have sexual intercourse with such female. The fact of the defilement or attempted defilement may exist where the female has given her consent to such sexual intercourse as well as when she has not given her consent. If the jury believe from the evidence in this case that the deceased, William Tibbitts, had sexual intercourse with the wife of the defendant, or attempted to have such intercourse with her, and if the jury further believe from the evidence that the defendant killed the deceased, William Tibbitts, in a sudden heat of passion, and if the jury further believe from the evidence that said sudden heat of passion was caused by the said sexual intercourse, then the jury should find the defendant not guilty." Notwithstanding the charge thus given, the appellant insists that the court erred in refusing his request. His contention is that the charge of the court limits justifiable homicide to cases in which the act of defilement can be actually proven, while he claims the law is that one is justified in acting upon appearances, with due limitations as to caution, even where the appearances may deceive the person acting. Neither in his request nor in his contention does he make any limitation as to time—whether the appearances which led to the homicide must have been present at the very time of its commission, or whether they may have occurred hours or days or any time previous thereto. Nor does this proposition require that the appearances at the time of the fatal act be such as would be likely to arouse in an ordinarily reasonable man an uncontrollable heat

of passion, or that the act must have been committed by the accused while under the influence of such passion, and before sufficient time for cooling had elapsed, and for reason to again assert itself. This would certainly be a very broad and liberal construction of our statute, in favor of criminals of this character. Under such an interpretation of the law, whether an act by which the accused took the life of a human being was justified would depend almost exclusively upon the belief of the perpetrator of the crime. And this whether he acted upon appearances as they were at the time of the homicide or previous thereto, or upon information, derogatory to his victim, received hours, or even days, previous to the commission of the fatal act, whether true or false. Such a construction of the law, indeed, would not only shield and protect the heinous criminal, but expose the lives of law-abiding citizens to the villainy of the murderer, and become a reproach to civilization. The statute, in section 4168, Rev. St. 1898, provides, inter alia, that homicide is justifiable "when committed in a sudden heat of passion caused by the attempt of the deceased to commit a rape upon or to defile the wife, daughter, sister, mother, or other female relative or dependent of the accused, or when the defilement has actually been committed." It will be noticed that under this provision an accused must have acted while in "a sudden heat of passion," caused by the defilement or attempted defilement of one of the females mentioned, in order that his claim of justification for the killing of him who defiled or attempted to defile may avail him. The "sudden heat of passion" must have, at the time of the homicide, controlled his actions, stifled his power of reasoning, and, for the time being, rendered him incapable of distinguishing between right and wrong. Such uncontrollable passion must therefore necessarily have been aroused at such close proximity, in point of time, to the fatal act, as to have left no sufficient time intervening for cooling and for reason to again assert itself; and it follows that if, in any such

case, sufficient time has elapsed between the obtaining
of knowledge by the accused of the defilement or at-
tempted defilement and the commission of the homicide
for cool reflection and deliberation by him, the killing
is not justified, even though there has been a defilement
or an attempt to defile.   It is evident, therefore, that
an accused cannot rely, for justification of the homicide,
upon mere rumors heard or appearances observed by
him at any distance of time before he commits the fatal
act.   In the enactment of the provision of the statute
under consideration the Legislature evidently designed
it to apply only to cases where the accused had come
suddenly upon the defiler, in the act of defiling, or of
attempting to defile, or where he had unexpectedly re-
ceived reasonably reliable information of the same, and
the fatal blow was struck or act done in an uncontrol-
lable passion, suddenly aroused because of the sudden-
ness of the occasion, and in the absence of sufficient time
for deliberation and for reason to gain sway over the
passion.   The law was not intended to shield an accused
who, because of mere rumors or appearances, which he
himself deems but to be evidence of undue familiarity
between the male and the female, determines to kill
them, and then with that purpose in view, pursues them,
and deliberately and willfully shoots them down while
in no act of defilement, and not even in a compromising
position.   Such killing renders the perpetrator guilty
of murder in cold blood, and the statute will furnish
him no protection.

In People v. Halliday, 5 Utah 467, 473, 474, 17 Pac.
122, this court, construing a like statute, said:   ''The
provision of law quoted justifies a homicide committed
by the husband in a sudden heat of passion caused by
the attempt of the man slain to defile his wife, or caused
by her defilement.   But the killing must be without de-
liberation after knowledge of the fact.   The law will
not permit the husband to say that he slew the defiler
of his wife in a sudden heat of passion after deliberat-
ing upon the defilement 24 hours.  .  .  .   The law is

that if the husband, after learning of the defilement of his wife, waits and deliberates, and then kills the defiler, in so doing he commits the crime of murder." Price v. The State, 18 Tex. App. 474, 51 Am. Rep. 322. In the absence of such a statute, proof that accused had done the killing in a heat of passion while the deceased was in the act of defiling, or in an attempt to defile, the wife or relative of the slayer, would not justify the homicide. Such proof at common law would only reduce the crime to manslaughter. "If a man," says Blackstone, "takes another in the act of adultery with his wife, and kills him directly upon the spot, though this was allowed by the laws of Solon, as likewise by the Roman civil law (if the adulterer was found in the husband's own house), and also among the ancient Goths, yet in England it is not absolutely ranked in the class of justifiable homicide, as in case of a forcible rape; but it is manslaughter. It is, however, the lowest degree of it, and therefore in such a case the court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation." 4 Bl. Comm. 191. So in 2 Bishop, Crim. Law (7th Ed.) 708, the author says: "If a husband finds his wife committing adultery, and, provoked by the wrong, instantly takes her life or the adulterer's, . . . the homicide is only manslaughter. But if, on merely hearing of the outrage, he pursues and kills the offender, he commits murder. The distinction rests on the greater tendency of seeing the passing fact, than of hearing of it when accomplished, to stir the passions; and if a husband is not actually witnessing the wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrongdoer, the offense, is reduced to manslaughter."

As we interpret the statute, it was intended to so modify the common law that a homicide would be justified where by that law the facts and circumstances would reduce the offense to manslaughter. It follows, therefore, that the proof of facts and circumstances

which would be insufficient to reduce the offense to manslaughter at common law is insufficient to justify the homicide under the statute.

The proof in the case at bar shows the accused was a man 28 years of age. He married a girl of 15—a mere child—and took her to his home, a "half dugout of one room," away from friends and neighbors, greeted by nothing but poverty, and left her there alone for several days at a time. She, in her loneliness, went to neighbors, which was but natural, and which any man of reason would expect. The neighbors sympathized with her, and, seeing that she was in a condition that she needed help, circulated a petition to raise money to send her to her people, living in other states. On several occasions, when, as appears, she had left home, the accused induced her to return to him. In her solitude she had at various times gone to other neighbors besides Mr. Tibbitts, and remained all night, but no witness except the accused observed any conduct on her part that created the impression or a suspicion of improper relations between her and Mr. Tibbitts, or any one else, and the most that the accused could charge her with, it seems, was undue familiarity, and this because, as he says, at one time, long prior to the commission of the homicide, he saw Mr. Tibbitts have his arm around her waist; but this it appears was not observed by the witness Rose, who was there at the same time, and who, although present at the Tibbitts home during the times Mrs. Botha was there, testified that he never saw anything improper between her and Mr. Tibbitts. Without doubt the young wife's lamentable situation was still more intensified when she learned from her husband's own lips that he was a murderer. Having received this horrifying information, can it be wondered at that she should become alarmed for her own safety? When she became aware that she had a husband who admittedly was guilty of the most heinous offense in the catalogue of crimes, how could she know she might not be—as, indeed, she proved to be—his next victim? Is-

it, then, under such circumstances, to be marveled why she sought aid of a neighbor, at whose house both she and her husband had previously stopped, to secure her trunk and assist her, especially when such aid and assistance had been withheld by another? Under such circumstances, in fear of her own life, having through his own confession of iniquitous guilt and the condition and situation in which he placed her and kept her, caused her not only to lose confidence in him, but also to lessen that wifely respect, admiration, and love which a woman naturally entertains for a worthy husband, her attempt to escape a life which evidently to her seemed unendurable was but a natural sequence. The circumstances of her situation serve largely to explain the design and actions of herself and Mr. Tibbitts, who, aware of her predicament, it may well be, assisted her out of sympathy, rather than for the purpose of defilement. When, therefore, the accused, on his return on that fatal day, found that his wife had left, and later, on his way to a neighbor, learned that Mr. Tibbitts had assisted her, with her effects, to his home, he was confronted with his own conduct toward, and. course of treatment of, his wife, and with the results which naturally flow from such conduct and treatment. Being thus confronted with his own wrong, the prisoner had no right to assume, as he now affects to have assumed, that his wife had left him because of the existence of improper relations between her and him who was assisting her, and then, in the absence of any evidence of defilement or attempt to defile, pursue and deliberately slay them. There is absolutely no proof in the record to justify under the statute, or that would mitigate at common law, such a willful and premeditated murder as this is shown to be. There is no testimony showing that there was a defilement, or an attempt to defile the wife of the prisoner, and therefore there was no proof upon which to base such an instruction as the defendant requested. It is true there is evidence to the effect that, after the accused had shot his wife, she pleaded

with him not to shoot Mr. Tibbitts, saying that he was not to blame; that, if any one was at fault, it was herself. But, in the light of the circumstances which caused her to leave the defendant, such statement so made by her cannot reasonably be construed into an admission of defilement. If the accused had been acting, as he would now have it appear that he acted, under the belief that there was defilement, that plea or statement of itself ought to have indicated to him that he might be mistaken, and caused him to hesitate, for, if there had been a defilement, or an attempt to defile, it would have been contrary to nature, especially in her tender years, for her, conscious of impending death, to plead innocence as to the author of her misfortune. Doubtless what the unfortunate young wife, stricken down by her own husband, meant, by her last utterance, was that, if there was any fault, it lay in her attempt to leave her husband, for which, evidently, in her opinion, Mr. Tibbitts was not to blame. Nor is there any evidence showing or tending to show that Mr. Tibbitts ever advised Mrs. Botha to leave her husband. Instead of hesitating, however, the accused simply demanded an "explanation," and, without giving time to explain, deliberately killed him whom his dying wife had just declared innocent, and thus committed the homicide for which he is here called upon to answer.

The prisoner now claims that the killing of his wife was an accident; that he put the gun to her back to push her aside, and accidently shot her. But when his conduct in, immediately after shooting her, as appears from the evidence of witness Rose, examining the wound, and pronouncing it a good job, is considered in connection with his conversation with the witness Patterson, several hours after the killing, wherein, among other things, clearly showing malice aforethought, he declared, "She was the first one to get it," and said, "I fixed them both so they could go off to heaven together," his claim of accident becomes futile,

27 Utah 20

State v. Botha.

and but suggests perjury added to hideous and shocking murder. Nature herself must revolt at such a crime, and pronounce the perpetrator an inhuman prodigy. Surely, it suggests the lamentable thought that, after all, no creature upon God's footstool is susceptible of greater cruelty than fallen man. It seems a mind once bent on total depravity has depths fathomless. As to such a case, a court of justice can but permit the majesty of the law to assert itself for the protection of law-abiding humanity and the purification of society.

Under the facts and circumstances disclosed by this record, we do not hesitate to hold that the request to charge under consideration was properly refused, **4, 6** and that the instructions of the court above quoted were more liberal, in favor of the prisoner, than was warranted by the proof. Nor do we think the court, under the circumstances erred in refusing either of the other requests of the defendant to charge. Nor, after careful examination and consideration of all the questions presented, do we find any reversible error.

The judgment must therefore be affirmed, and the case remanded for further proceedings according to law. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.