**UNITED STATES of America**

v.

**Melvin Davis REES, Jr.**

**Cr. No. 25300.**

United States District Court
D. Maryland.

March 22, 1961.

Leon H. A. Pierson, U. S. Atty., Robert E. Cahill and H. Russell Smouse, Asst. U. S. Attys., Baltimore, Md., for plaintiff.

William J. O'Donnell and William J. Evans, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

The first count of the indictment in this case charges that on or about the 11th day of January, 1959, Melvin Davis Rees, Jr., knowingly transported from the vicinity of Bumpass, Louisa County, Virginia, to a farm lane off Mt. Tabor Road, near Gambrills, Anne Arundel County, Maryland, Mildred Ann Jackson, whom defendant had unlawfully kidnapped and held for the purposes of having sexual gratification upon her body, of beating her, and of killing her and that the said Mildred Ann Jackson was not liberated unharmed but was in fact killed. 18 U.S.C.A. § 1201(a), (b). The second count is similar, except that it charges kidnapping and transporting Susan Ann Jackson for the purposes of beating and killing her and for the further purpose of avoiding detection, apprehension and

arrest, and charges that she was not liberated unharmed but was in fact killed. A jury found him guilty on both counts, but did not recommend the death penalty. After making appropriate motions during the trial, defendant has now moved for a judgment of acquittal under Rule 29(b), F.R.Crim.P., 18 U.S. C.A., and, in the alternative, under Rule 33, for a new trial. He rests his motion for judgment of acquittal upon the claimed lack of sufficient evidence to prove that Mrs. Jackson and Susan were transported alive into Maryland. The motion for new trial questions the admissibility of various items of evidence and raises other points which will be discussed below.

There was direct or circumstantial evidence from which the jury might reasonably have found the following facts:

On Sunday, January 11, 1959, at about 6:00 p. m., defendant left the beach house near Norfolk, Virginia (where he was living with Pat Routt, a married woman, together with another unmarried couple) too late to keep a scheduled engagement at a restaurant in Washington, D. C., where he usually played a vibraphone in a trio on Sunday nights. Shortly after 9:00 p. m. that night, on an unlighted secondary road in Louisa County, Virginia, defendant drove his Ford automobile past another car in which Mr. and Mrs. Keith Waldrop were riding with two small children, forced them off the road, and while the cars were side by side started to get out of his car, presenting such a disheveled appearance that Waldrop drove his car over a ditch by the side of the road and escaped. Defendant proceeded up the road past the Waldrops' home and stopped another car on another dark road in Louisa County at about 10:00 p. m. This car was occupied by Mr. and Mrs. Carroll Jackson, their five year old daughter Susan and their one year old daughter Janet. The Jacksons were transferred to defendant's car, and their car was left on the side of the road. Shortly thereafter, in a wooded area near Fredericksburg, Virginia, defendant shot Carroll Jackson through the head with

defendant's .38 Colt Cobra revolver, after beating him on the head with the butt of the revolver so severely that the screw holding the plastic pistol grips in place broke, causing the grips to fall to the ground. Defendant covered with branches the body of Carroll Jackson and the body of the baby Janet, who died of suffocation and exposure after being injured by a blunt instrument. He then drove Mrs. Jackson and Susan to an old, abandoned house at the end of a private lane off Mt. Tabor Road, near Gambrills, Anne Arundel County, Maryland, an area with which defendant was familiar and only about 20 miles by road from his parents' home in Hyattsville, Prince George's County, Maryland. Defendant took Mrs. Jackson into the house, where a button off her coat was later found. There or nearby he beat her brutally about the right side of her face and head, probably with his left fist (he is left handed), and forced her to her knees so hard that her knees were bruised. His purpose was to perform an abnormal sexual act on her and to try to persuade or force her to perform an abnormal sexual act on him. The injuries about her head were so severe that she died of aspiration of blood into the lungs. A stocking had been tied around her neck so tight that it cut into her flesh, and it may also have been used to gag her. Most of the blood was aspirated while she was lying on her back either in or near the grave which defendant dug for her and Susan in the sandy soil. Susan had died from the effects of a very severe blow on the back of her head. Defendant went to his parents' home in Hyattsville that morning.

The bodies of Carroll Jackson and the baby Janet were found on March 4, 1959. During a search of the wooded area around the bodies immediately thereafter, the pistol grips and Carroll Jackson's spectacles were discovered. An F.B.I. expert testified positively that one of the pistol grips had at some time been on a .38 Colt Cobra revolver, which was found in defendant's father's home, was admitted by defendant to be his, and

was received in evidence, and that the grip had been on the revolver when it struck something hard. The bodies of Mrs. Jackson and Susan were discovered on March 21, 1959.

Defendant was arrested by the F.B.I. in Memphis, Tennessee, on June 24, 1960.[1] On the same day, the .38 Colt Cobra revolver was discovered by the F.B.I. hidden in his parents' home. On June 28, 1960, defendant was indicted by the Grand Jury for the District of Maryland for the kidnapping and transportation of Mrs. Jackson and Susan.

To represent defendant, Judge Watkins appointed William J. O'Donnell, Esq., a leader of the Bar experienced in criminal cases, and William J. Evans, Esq., an able, young trial lawyer who had been an Assistant United States Attorney.[2]

### 1. Motion for Return of Property and to Suppress Evidence.

Defendant filed no motion for the return of any property or to suppress any evidence before the trial. However, after the trial had been in progress for more than a week and after there was positive testimony that Carroll Jackson had been shot with a .38 caliber bullet, counsel for defendant filed a motion under Rule 41 (e), F.R.Crim.P., to suppress and for the return of certain property which defendant then for the first time said belonged to him and which had been seized on June 24, 1960, at his parents' home in Hyattsville, Maryland. Information with respect to these items had been furnished to defendant and his counsel and the important items had been shown to his counsel long before the trial. A hearing was held on the motion out of the presence of the jury and with only such persons present as defendant wished to be present.

The evidence taken at that hearing showed that on the afternoon of June 24, 1960, the day defendant was arrested in Memphis, Tennessee, a number of agents of the F.B.I. visited the home of defendant's parents in Hyattsville, told them of their son's arrest and said that the agents would like to search the house. Appropriate written authority was given by defendant's father, with the oral approval of defendant's mother. It was a two story house, with an attic reached by a pull-down ladder. There were one or two spare rooms on the second floor, which were occupied from time to time by the children and grandchildren of Mr. and Mrs. Rees, Sr., on visits, and some of defendant's clothes may have been in one of the second floor rooms.

The search included the third floor attic room, in which various household goods belonging to Mr. and Mrs. Rees were stored along with old school books, etc., belonging to defendant and the other children. An open closet in the attic contained similar material. In the lower rear wall of the closet one of the agents noticed that the wall had been cut permitting entry into a dark crawl space over the rafters. A flashlight showed a number of items at the far end of this crawl space. One of the items was an old case, which later proved to be an accordion case but looked like a suitcase, padlocked and bearing a tag on which was written "Dennis J. Werber, 811 Delafield Place, N. W., Wash. 11, RA 6–0532". When the case was discovered, the agents asked Mr. Rees if he knew anything about it. He said that he didn't know whose it was, that he had never seen it in the possession of his son, that he did not

---

1. He was arrested on a warrant alleging unlawful flight to avoid prosecution in the Circuit Court for Anne Arundel County for the murder of another woman. This fact was not offered in evidence before the jury but was stated during the hearing on the motion to suppress certain evidence.

2. A psychiatric examination made before trial by Dr. Manfred S. Guttmacher showed that defendant was not psychotic, but was able to stand trial and to cooperate with his counsel. Defendant did not raise any question of insanity at the trial, and did not show any lack of sanity in his testimony given on the motion to suppress or in his demeanor during the trial.

know Dennis J. Werber, and could not account for its presence "back in this uninhabited portion" of his house. Mr. Rees agreed that it should be opened. It was opened by the agents and was immediately seen to contain a .38 Colt Cobra revolver and a mass of obscene material, including pictures of scantily clad women with penciled drawings added showing their arms tied, etc. Mr. Rees looked over some of the material, said that he had never seen the gun before, and, when asked if it belonged to his boy, answered, not to his knowledge. He said nothing at all about the other material. Mr. Rees consented that the material be taken away by the F.B.I. for further examination and was given a proper receipt. When examined by the F.B.I., the material was found to include an account of the Jackson kidnapping and murder written by defendant in his own handwriting, illustrated with pictures of Mrs. Jackson and Susan taken from a newspaper, with a gag drawn in pencil over Mrs. Jackson's mouth. The account was partly in the first person, extremely brutal and obscene, and contained some details which had never been published in any newspaper.

Soon after opening the case the F.B.I. called the telephone number shown on the tag, which proved to be the home of Werber's parents. Werber was no longer living there, but his address was obtained and he denied ownership of anything contained in the case, saying that he had agreed to sell the accordion and case to defendant, but when defendant did not pay for it he had tried to get them back.

At the hearing on the motion, defendant stated that the case was his, having been sold to him along with an accordion by Werber, although he had never paid for it. He said that he had used it for a while to carry the accordion and for a while to carry clothes while he and Pat Routt were traveling around the country with an orchestra in which he was playing. He said that he had visited his parents' home for a couple of days in the Spring of 1960 while he and Pat Routt were living in an apartment in Washington, before they went to Memphis. He also said that one of those days had been spent preparing the obscene material and that he had stored the whole mass, including the gun, in the case and placed the case in the back of the crawl space. He had said nothing to his parents about it.

Defendant had a key to his parents' home and could come and go as he pleased. However, he had stayed in the house only two nights during 1960 and had last lived there regularly in the Fall of 1958. Since that time he had been living at various places with Pat Routt, who was not welcome in his parents' home. When he stayed at their house he used several different rooms, including rooms on the second floor and the attic. Those rooms were also used by other members of the family.

By their motion filed on February 7, 1961, ten days after the trial began, defendant's counsel sought the return of the gun and the obscene material and the suppression of those items as evidence. The government had mentioned the gun and the account very briefly in its opening statement, without objection from counsel for defendant, who had devoted a substantial part of his opening statement to a discussion of the obscene material in painting a character picture of the defendant as a foolish, unorthodox, but mild young man.

The motion raises questions of search and seizure under the Fourth Amendment, self-incrimination under the Fifth Amendment and timeliness of the motion under Rule 41(e), F.R.Crim.P.

That Rule provides: "The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing." I found and adhere to my finding that there was an opportunity for defendant to make the motion before trial, that he was represented by able, experienced counsel, and that substantially all of the facts were known before the trial to defendant and his

counsel who delayed making the motion for sufficient, strategic reasons. I therefore ruled and adhere to the ruling that the motion was made too late insofar as it sought a return of the property or a suppression of the evidence under the Fourth Amendment.

However, I ruled that the court should weigh all the facts in determining the admissibility of the evidence under the Fourth and Fifth Amendments considered together.

■ It was the home of Mr. and Mrs. Rees, Sr., and they had the right to authorize the search of the entire house. No part of the premises had been set aside for the defendant's exclusive use. Calhoun v. United States, 5 Cir., 172 F.2d 457, certiorari denied 337 U.S. 938, 69 S.Ct. 1513, 93 L.Ed. 1743; Cutting v. United States, 9 Cir., 169 F.2d 951; Woodard v. United States, 102 U.S.App. D.C. 393, 254 F.2d 312; Fredricksen v. United States, 105 U.S.App.D.C. 262, 266 F.2d 463.

The search of the case was not unreasonable. The only indicia of ownership was the tag, bearing a name unknown to the owners of the house, with no indication that the case belonged to defendant. It had been left in a crawl space without the knowledge of the owners of the house. Mr. Rees did not know to whom the case belonged; it might have been placed there by him or for him and then forgotten, or it might have been abandoned by a previous occupant of the house. Under the circumstances, Mr. Rees had the right to authorize the F.B.I. to open the case.

To support a contrary ruling, defendant relies upon Holzhey v. United States, 5 Cir., 223 F.2d 823. But there the search was conducted in an area of the premises set aside for the defendant's exclusive use and for which she paid rent, and involved a cabinet which was known to be the property of the defendant. Defendant also argues that the case and its contents were in his constructive possession. I find they were not. Such technical considerations of property law are not controlling, Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697; the question is whether the search was unreasonable, Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Abel, 2 Cir., 258 F.2d 485, affirmed 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, rehearing denied 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019; Harman v. United States, 4 Cir., 210 F.2d 58; Smith v. United States, 103 U.S.App.D.C. 48, 254 F.2d 751, certiorari denied 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552.

Having lawfully opened the case, the agents had the undoubted right to seize any instruments of a crime which they were investigating or the fruits of such a crime. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, rehearing denied 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; United States v. Thomson, 7 Cir., 113 F.2d 643, 129 A.L.R. 1291; United States v. Lerner, N.D.Cal., 100 F.Supp. 765. In view of the report they had received from the Medical Examiner of Virginia and the pistol grips which had been discovered near Carroll Jackson's body, the F.B.I. were looking for a .38 Colt revolver. They even knew the range of serial numbers probably on the revolver used in the crime.

The search was not unreasonable, and the agents were entitled to seize the revolver.

■ The obscene material cannot properly be said to be either means of committing the crime or fruits of the crime, although the government argued that the account of the Jackson kidnapping, perverted sexual assault and murders, might be considered fruits of the crime in view of the evident satisfaction defendant drew from writing it. Under such cases as Gouled and Abel, a distinction must be made between instruments and fruits of a crime on the one hand, and mere evidence of the crime on the other. When the case was opened, it was apparent to Mr. Rees that the papers did

not belong to him, and he did not have the right to authorize the agents to take the papers away with them. The question therefore is whether the agents had the right to take the papers without permission from their owner or his agent.

If the papers might properly be considered to have been abandoned by defendant, they would be subject to seizure and admissible in evidence. See Abel v. United States, supra. But under all the evidence, I cannot find that they were abandoned by defendant. They were papers as to which he was entitled to the benefit of the Fourth Amendment, especially when considered in conjunction with the Fifth Amendment. Gouled v. United States, supra; Abel v. United States, supra. See also United States v. Guterma, 2 Cir., 272 F.2d 344.

Since the agents were justified in opening the case, it may well be that they could have testified to what they observed, even though the contents could not lawfully be seized. Zap v. United States, 328 U.S. 624, 629, 66 S.Ct. 1277, 90 L.Ed. 1477. In the instant case, however, the government did not proffer such testimony.[2a] The government contended that since the case contained a mass of obscene material taken from magazines, etc., the agents had a right to examine the material to determine whether it had been taken from interstate commerce in violation of 18 U.S.C. § 1462 or had been otherwise assembled or written in violation of any law of the United States or of the State of Maryland. If the seizure of the material can be justified on that ground, defendant would have no valid argument for its exclusion based upon the Fourth Amendment alone. My ruling excluding it was based upon the Fourth and Fifth Amendments, considered together in the light of Abel and Gouled.

It is a close and difficult question whether the account of the crime should have been admitted in evidence; the refusal to admit it was partly motivated by the consideration that once admitted in evidence and published in detail, it would be very prejudicial to the jury not only in this but also in any possible future trial in this district or in any state court in which defendant might be tried for any of the several murders with which he is now charged. On the other hand, the same considerations strengthen my conviction that the motion to return the property should not be granted. Some other court may conclude that the account is admissible, and the interests of the people in bringing to justice whoever perpetrated these brutal crimes is so great that defendant should not be allowed to destroy that evidence.

### 2. The Pistol Grips.

The pistol grips referred to in the Statement of Facts, above, were found by a member of the Fire Rescue Squad of Spottsylvania County, Virginia, near the bodies of Carroll and Janet Jackson about an hour after the bodies were found on March 4, 1959. The grips were immediately turned over to Trooper Rockcharlie of the Virginia State Police, who kept them in a box until he turned them over to Investigator Cooper of the Virginia State Police about an hour later. Investigator Cooper testified positively that the right pistol grip, which had a small break in the bottom, was one of the grips which had been turned over to him and that it was in the same condition as when he received it. He said that the left grip looked like the one which was turned over to him and was still in the same condition. The government proved the custody of the grips and the custody of the pistol from the time they were discovered until they were turned over for examination to the F.B.I. expert, who testified positively that the right grip had at one time been on the particular .38 Colt Cobra revolver which defendant admitted to be his. Defendant contends that the grips should not have been admitted in evidence because two of the men who saw the grips did not recall having seen the small break

2a. There was testimony that the agents did not see the account until after the case was removed to the F.B.I. office.

in the right grip, and one of the witnesses said that when the grips were found there was a screw attached to one of them and the grips as offered show only a small, metallic end of a screw. That evidence did not render the grips inadmissible; its weight was for the jury.

### 3. The Attack on Mr. and Mrs. Tuozzo.

■ In his opening statement counsel for the defendant told the jury that there would be no evidence that Rees knew the Jacksons and that the government would not be able to show any motive for Rees to attack them. On cross-examination of the government's witnesses, defendant's counsel elicited some evidence tending to prove that defendant's character was good. They also developed that there was no physical evidence of any sexual intercourse or attempted sexual intercourse with either Mrs. Jackson or Susan, although the Medical Examiner said he had not examined Mrs. Jackson's mouth for semen. It was therefore important for the government to show a motive for the attack. To show such a motive, the government offered the testimony of Mr. and Mrs. Frank Tuozzo. After a proffer outside the presence of the jury, I ruled that the evidence was admissible for reasons which will be discussed below, after a summary of the testimony.

Mrs. Tuozzo testified that about 10:00 p. m. on August 24, 1958, she and her husband were driving along an unlighted, little-used road in Prince George's County, near Laurel, Maryland, when they were forced off the road under circumstances similar to those to which the Waldrops had testified, by a man whom Mrs. Tuozzo identified positively as defendant, driving a car like defendant's car. Mrs. Tuozzo testified that defendant slid across the seat, got out, and threatening her husband with a revolver, forced him to get into the trunk of defendant's car and forced her to sit on the floor of

that car while he drove to an even darker, more secluded lane in a wooded area. There he performed an abnormal sexual act on her, using his mouth, and attempted to persuade her to perform an abnormal sexual act on him with her mouth. He suddenly relented, said that she had been a good woman, had not cried out, and that he was glad it had not been any worse. Defendant then released her and her husband, and they ran away through the woods. Mr. Tuozzo also identified the defendant. His testimony was limited, in order to keep to a minimum the evidence about the incident.

The admissibility of evidence of other similar offenses was discussed fully in Lovely v. United States, 4 Cir., 169 F.2d 386. See also Swann v. United States, 4 Cir., 195 F.2d 689, and McCormick on Evidence, sec. 157, p. 326 et seq.

■ Unless the accused offers evidence of his good character, the prosecution may not introduce evidence of other criminal acts of the accused unless such evidence is relevant for some other purpose than to show a probability that he committed the crime on trial because he is a "bad man". There are numerous purposes for which evidence of other criminal acts may be offered, and when so offered the rule of exclusion is inapplicable. Some of those purposes are referred to in the Fourth Circuit cases cited above and are listed by McCormick, p. 328 et seq., with the warning that the purposes are not mutually exclusive; a particular line of proof may fall within several of them. Some of the purposes listed by McCormick are not important here.[3] Others, listed on pp. 328–30, are important, e. g. "(3) To prove other like crimes by the accused so nearly identical in method as to ear-mark them as the handiwork of the accused. * * * (6) To establish motive. This in turn may be evidence of the identity of the doer of the crime on charge, or of deliberateness, malice, or a specific intent constituting an element of the crime. * * * (8) To

---

3. E. g. (1) To complete the story of the crime on trial by proving its immediate context, and (2) to prove a continuing plan or scheme, which will be relevant as showing motive, identity and intention.

prove identity. This is accepted as one of the ultimate purposes for which evidence of other criminal conduct will be received. It is believed, however, that a need for proving identity is not ordinarily of itself a ticket of admission, but that the evidence will usually follow, as an intermediate channel, some one or more of the other theories here listed. Probably the second (larger plan), the third (distinctive device) and the sixth (motive) are most often resorted to for this purpose."

Also included in McCormick's list is "(4) To show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial. Other like sexual crimes with other persons do not qualify for this purpose. It is arguable that certain unnatural sex crimes are in themselves so unusual and distinctive that previous such acts by the accused with anyone are strongly probative of like acts upon the occasion involved in the charge, but the danger of prejudice is likewise enhanced here, and most courts do not admit such acts with other persons for this purpose." However, in Lovely v. United States, supra, Judge Parker said: "While evidence of other similar offenses is held admissible for the purpose of establishing intent in cases of assault with intent to commit rape (Wigmore on Evidence, 2d ed., sec. 357), and evidence of other offenses of like character is admissible in prosecutions for crime involving a depraved sexual instinct (See Bracey v. United States, 79 U.S.App.D.C. 23, 142 F.2d 85), the overwhelming weight of authority is that such evidence is not admissible in prosecutions for rape. The reason for the difference in the rule applicable is obvious. Other attempts to

ravish have a tendency to show that an assault under investigation was made with like intent. *Acts showing a perverted sexual instinct are circumstances which with other circumstances may have a tendency to connect an accused with a crime of that character*. The fact that one woman was raped, however, has no tendency to prove that another woman did not consent." (Emphasis supplied) 169 F.2d at page 390.[4]

Professor McCormick concludes, p. 332, that the admissibility vel non of such evidence should not be controlled by an arbitrary rule, but that the court in each case should balance "on the one side, the actual need for the other-crimes-evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." In the instant case, the need for the evidence was great; the Jacksons are not alive to identify the assailant and to testify to facts showing his motive; and the motive for the attack was not otherwise apparent. The possible inflammatory quality of the Tuozzo testimony was minimized by limiting it to essential details and by the fact that the Tuozzo incident was less shocking than the crime on trial. This is a case where the balance was in favor of allowing the government to introduce this evidence, which was clearly relevant and material.[5]

The testimony was admitted primarily for the purpose of showing motive; however, its admissibility on that ground

---

4. See also State v. Edwards, 224 N.C. 527, 31 S.E.2d 516; Frank v. State, 141 Ga. 243, 80 S.E. 1016, 1022; State v. Jackson, Summit County, 82 Ohio App. 318, 81 N.E.2d 546; Commonwealth v. Kline, 361 Pa. 434, 65 A.2d 348; United States v. Pape, 2 Cir., 144 F.2d 778; Paine v. United States, 9 Cir., 7 F.2d 263.

5. There was no element of surprise. Defendant was told on November 1, 1960, that the government was considering offering the testimony of Mr. and Mrs. Tuozzo and the facts to which the government believed they would testify. They were included in the list of witnesses furnished to defendant thirty days before trial, and on the day before the trial started defendant filed a memorandum with the court discussing the admissibility of this evidence.

is strengthened by other factors listed in McCormick, some of which are referred to in the Fourth Circuit cases. Motive and propensity, the "perverted sexual instinct" referred to by Judge Parker in Lovely, are closely related; the pattern of the three attacks—on the Tuozzos, the Waldrops and the Jacksons —had distinctive features tending to "ear-mark them as the handiwork" of one man; [6] and defendant had already adduced some evidence tending to show his good character.

Counsel for defendant repeatedly refused the offer of the court to explain to the jury the reason for the admission of this testimony or to limit the jury's consideration thereof to the issue of motive, but counsel declined such an instruction —wisely in my opinion—preferring to handle the matter in their own way in their closing arguments, without comment by the court.

Upon review of the facts and the law, after considering the argument of counsel for defendant on the motion for new trial, I adhere to my ruling that the rules of evidence and the interests of justice alike required that this evidence be admitted.

#### 4. Cross-examination of Moser.

■ Glenn Moser, the other man in the foursome at the beach house near Norfolk, was offered by the government to prove that defendant left the beach house about sundown on January 11, 1959. Counsel for defendant undertook to show by cross-examination of Moser and by other evidence that Moser was interested in obtaining the reward offered for the conviction of the Jackson murderer, and that he was biased and prejudiced against defendant.

Moser had reported Rees to the F.B.I. as the possible murderer before the bodies were found but after it was a matter of general knowledge and interest in Virginia that they had disappeared. They also sought to show by cross-examination of Moser and other evidence that Moser owned a pistol, that he had a bad temper, and that he had struck his paramour and his mother. Cross-examination of Moser was permitted to show pecuniary motive, bias or prejudice, but not to show his character except as it would affect his credibility. Specifically, I refused to allow defendant's counsel to cross-examine Moser to show that he had a bad temper or that he owned some sort of pistol, unless defendant made Moser his witness on those subjects, which had not been included in the direct examination. Defendant refused to make Moser his witness then and did not call him later, although at defendant's request he was kept available in the witness room during the entire trial.

I see no error in my rulings on this point.

#### 5. Testimony of Dr. Mann.

■ Dr. Mann's long experience as a medical examiner, the large number of bodies he has examined where death was caused by shooting, and the experiment which he conducted, qualified him to express the opinion that Carroll Jackson was shot with a .38 caliber bullet.

Defendant's objection, that the experiment was conducted out of the presence of the jury, is without merit. McCormick on Evidence, Chapter 20.

#### 6. Evidence of Transportation Alive.

■ Although the point does not appear to have been authoritatively decided by any court, I instructed the jury, at defendant's request, that transportation alive across the Maryland line was an essential element of the crime which had to be proved to their satisfaction beyond a reasonable doubt. Defendant's motion for judgment of acquittal is based en-

6. All three incidents took place about the same time of night on a deserted county road. In each of them, a car was run off the road after the assailant had flashed his bright lights from behind the overtaken car. In each incident a man and a woman were stopped, indicating a desire to take the woman from the man, rather than to pick up a lone woman. In both the Tuozzo and the Jackson incidents, the victims were taken to a secluded area.

tirely upon the claimed insufficiency of the evidence to show that Mrs. Jackson and Susan were alive when they were taken across the State line. There was direct or circumstantial evidence of the following facts:

The Jackson family left the Hills' home at about 9:40 p. m. on Sunday, January 11; they traveled about seven miles to the place in Louisa County, Virginia, where their car was forced off the road by defendant, and they were transferred to his car at about 10:00 p. m. Defendant arrived at his parents' home in Hyattsville, Maryland, around 10:30 a. m., on January 12, and reported for work at 3:00 p. m. that day. The whole evidence in the case supports a finding that all four of the victims were killed during the period of twelve hours after they were kidnapped.

The evidence indicates that Carroll Jackson and the baby Janet were killed at about 11:00 p. m., at or near the grave site in Spottsylvania County, Virginia, a few miles from Fredericksburg.[7] Dr. Mann testified that Carroll Jackson died between three and one-half and four and one-half hours after his last meal, which he had finished before he drove to the Hills' home at 8:00 p. m. on January 11.

Mrs. Jackson and Susan did not die until between 2:00 and 4:00 a. m. on January 12. Dr. Fisher testified that Susan's stomach contents indicated that she died a minimum of five hours after her last meal and a maximum of eighteen hours, more likely about eight hours after her last meal. His testimony as to the mother was similar; she probably died between seven to ten hours after her last meal. The evidence supports the inference that Mrs. Jackson and Susan were alive when defendant left the Fredericksburg grave site, and that defendant was in a hurry to leave that area and the State of Virginia.[8]

Defendant took Mrs. Jackson to Gambrills, Maryland, an area in which he had been seen on a number of occasions, and with which he was evidently familiar. In the deserted house near the Gambrills grave site, a button was found and identified as being from Mrs. Jackson's coat, which was wrapped about her body in the grave. No likely reason has been suggested for dragging a corpse into and out of the house; it is more likely that he took her alive to that secluded spot in order to accomplish his perverted sexual purpose. Dr. Fisher testified that there was aspiration of blood in the lungs of Mrs. Jackson, indicating that she had died in a prone position. The absence of sand in the lungs merely indicates that she had not been buried before she died; the absence of any evidence that the body had been dragged to the grave, plus the evidence that the stocking tied around her neck had cut into her flesh, indicates that she had been marched to the grave site and had died in the open grave or on the ground nearby.

The evidence justifies the inference that both Mrs. Jackson and Susan were killed at or near the spot where they were buried.

 That inference is aided by a number of presumptions.[9] The first is the reasonable presumption, generally recognized, that a person died in the state and county where his body was found. In Breeding v. State, 220 Md. 193, at page 200, 151 A.2d 743, at page 747, the court said: "Finally, the appel-

7. Carroll Jackson's watch stopped at 11:-09. Evidence indicating that Carroll Jackson was killed at the Fredericksburg grave site includes the pistol grips found near the body, the abrasions on Carroll Jackson's head caused by a blunt instrument consistent with a pistol, and Mr. Jackson's broken glasses, found nearby, all tending to show that a struggle took place there.

8. Since the Fredricksburg grave site was within 350 yards of a house, defendant may have feared that the occupants of that house would have heard shots at the grave site and notified the Virginia police. The hastily arranged grave at Fredericksburg corroborates this inference.

9. None of these presumptions was referred to in the charge to the jury.

lant contends that the State failed to prove that the killing took place in Caroline County or in Maryland. It is true that the State of Maryland cannot punish for a crime committed in another state, Bowen v. State, 206 Md. 368, 111 A.2d 844. But venue may be established by circumstantial evidence. The cases hold that the finding of a dead body in a particular county raises a presumption, or supports an inference, that the killing took place there." Some of the authorities speak in terms of venue, rather than jurisdiction, but it is clear that the prosecution must show that the crime was committed in the state as well as in a particular county, and the facts support the inference of the one as well as of the other.[10] See People v. Peete, 54 Cal.App. 333, 202 P. 51, 64; Commonwealth v. Costley, 118 Mass. 1, 26; Hawkins v. State, 60 Neb. 380, 83 N.W. 198; Wharton on Homicide, 3d ed., 1907, pp. 901–2.

■ There is also the presumption that life, like any other condition, continues until there is evidence to the contrary.[11] Wigmore on Evidence, sec. 2531, p. 462, 3d ed., and cases cited; McCormick on Evidence, p. 462; Allen v. Mazurowski, 317 Mass. 218, 57 N.E. 2d 544.

Finally, there is the provision in 18 U.S.C. § 1201(b) that "the failure to release the victim within twenty-four hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce." The primary purpose of this provision may have been, as argued by defendant, to permit the F.B.I. to begin its investigation of a case promptly; but H.R. 1457, 73rd Cong., 2d Sess., p. 2 (1934) stated: "The purpose of this provision is to clear up border-line cases, justifying Federal *investigation* in most of such cases and assuring the validity of Federal *prosecution* in numerous instances in which such prosecution would be questionable under the present form of this act. The legality of such a presumption would seem to be fairly within the rule established by the United States Supreme Court * * [Mobile, J. & K. C.] Railroad Company v. Turnipseed, (219 U.S. 35 [31 S.Ct. 136, 55 L.Ed. 78]): 'That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate'." (Emphasis added.)

I conclude that the evidence was sufficient to permit the jury to find beyond a reasonable doubt that Mrs. Jackson and Susan were alive when they were transported into Maryland. The motion for judgment of acquittal must be denied.

Finally, defendant argues that the verdict of the jury was against the weight of the evidence. After carefully considering defendant's arguments on this point, I am satisfied that the verdict of the jury was supported by the weight of the evidence and that the finding of guilty on both counts was a just verdict. The motion for a new trial must also be denied.

10. For a case where the jurisdictional fact of interstate transportation was aided by a presumption, see United States v. Washington, D.Md., 69 F.Supp. 143, Chesnut, J.

11. This is an entirely different presumption than the presumption of death after seven years.