399 P.2d 580

**The STATE of Utah, Plaintiff and Respondent,**

v.

**Arden E. TUTTLE, Defendant and Appellant.**

**No. 10205.**

Supreme Court of Utah.

March 9, 1965.

---

Mitsunaga & Ross, Salt Lake City, for appellant.

Phil L. Hansen, Ronald N. Boyce, Salt Lake City, for respondent.

CROCKETT, Justice:

Defendant appeals from his conviction by a jury of the crime of grand larceny.[1]

The contention of importance is that the trial court erred in admitting in evidence some boxes of shells and other firearm accessories which the defendant claims were obtained from his home by an unlawful search.

Defendant Arden Tuttle was at the time of the crime on November 18, 1961, an 18 year-old youth living at the family home in Manti, Utah. On that day he had made several trips in and out of the Harmon's Store in hauling coal from there to his home and was the last customer to leave the store that night. The next day Mr. Harmon discovered that two rifles, three shotguns, a number of boxes of ammunition, some other firearm accessories and a few dollars in change were missing from his store. In investigating the crime, the town marshal, Calvin Nielson, questioned the defendant on two different occasions, but he denied know-

---

1. Secs. 76–38–1 and 4, U.C.A.1953.

ing anything about it. Shortly thereafter defendant was inducted into the U. S. Air Force.

It was about a year later, on November 27, 1962, that the Marshal and Leonard Harmon for reasons not clear from the record decided that they should search the Tuttle home. The question as to whether the search was an unlawful one is dependent upon what occurred when they did so. Defendant's mother, Mrs. Betty Tuttle, was the only one home at the time. There are some points of divergence between her testimony and that of Marshal Nielson. His version was that they requested and that she gave them permission to make the search and led them to the room her son had occupied before going to the service. The essentials in which her testimony differed were these:

"Q. Did you ask them for a search warrant?

"A. Yes.

"Q. And what did they say to you?

"A. Oh, we don't need one.

"Q. Did they say anything else to you?

\*     \*     \*     \*     \*     \*

"A. I said, "Well, it is the law that you should have a search warrant before you make a search." And they said, "Oh, we don't need it. But if you want it all we have to do is go right up to Tibbs [the county attorney] and get it and be back down and we will have a search."

"Q. Was anything further said?

\*     \*     \*     \*     \*     \*

"A. Well, they mentioned that they wanted to find out what this was and find out and get this straight and make the search and do what they could, and that if he was, let's say, found guilty that he would lose his citizenship and they, if they brought him out of the Army that he would be dishonorably discharged and he wouldn't be able to own property of any sort, and made, you know, several statements to that point that we more or less don't think that they were completely all true."

At this point it is appropriate to note that the foregoing statement could well be regarded as being tailormade as an afterthought to fit a contention of coercion. In that connection it is significant that it did not come from Mrs. Tuttle as a free and natural expression, but from a statement she attempted to read. She stated:

"A. I have a little sworn statement here. Can I read this:

"Q. I don't think you can read it. But you can refresh your memory.

"A. It know it. *But this words it nicer than I could,* unless you have covered it.

"Q. Just tell it to us. Tell us what you had in mind. You can refresh your memory \* \* \*."

It was then that she made the foregoing statement. She then further testified:

"Q. And after they told you that what did you do then? Did you still refuse or did you allow them to go and search?

"A. Well, after we had—it was—they tried to be friendly enough about it and all and it has been stated that we were on good terms with the Harmons and so I guess you know how it is between friends, you probably don't always do the best thing. So I said, well if they wanted to go ahead knowing they were violating the law to make the search, it was, they could go. Which they did."

After the conversation just related, Mrs. Tuttle led the two men to the room defendant had occupied. There in an old gramophone cabinet they found a telescopic sight, a shotgun cleaning kit, two rifle recoil pads, several rifle and shotgun shell boxes and some shells, Exhibits 2 to 8. From the fact that Mr. Harmon identified his store markings on these items and that they corresponded to some of the items taken in the larceny referred to, the Marshal took them and gave Mrs. Tuttle a receipt. Some days later, in pursuing her curiosity about the contents of some boxes in this room, Mrs. Tuttle unlocked them and found a large number of pennies (about 150) and a considerable quantity (about $66.00 worth) of rifle and shotgun shells. She phoned Mr. Richard Harmon, asked him to come over, and delivered these items to him. A few days after these occurrences, while the defendant was home on leave, Marshal Nielson confronted him with the facts related above and again questioned him about the affair. The parties dispute each other as to whether the defendant admitted the theft. Marshal Nielson states that he did and offered to pay for the merchandise in order to make things right. The defendant denies admitting he stole the articles, but admits that he said he would pay for them. He justifies this by saying that he did so in order to avoid any possible difficulties in the Air Force.

The practical exigencies of a trial render it imperative that the trial judge have the prerogative of ruling upon questions of admissibility of evidence and upon issues of fact incidental to that purpose. For this reason, and because of his position of advantage to observe the demeanor of witnesses and other factors bearing on credibility, his ruling thereon should not be disturbed unless it clearly appears that he was in error. If the court were not indulged this prerogative and were bound by any story which a self-interested witness may tell which would make a search unlawful, it requires but brief reflection to reveal what mischief could result in thwarting efforts of officers proceeding reasonably and in good faith to solve crimes and enforce the law.

■ There can be no question about Mrs. Tuttle's right to give consent to search her home,[2] nor to the legality of a search made pursuant thereto.[3] Upon the basis of evidence here we can see no reason for concluding that the trial court was in error in believing that she did so.

■ A further difficulty with the defendant's position is that there was no timely objection made to the evidence in question. Everything concerning such evidence and the state's reliance on it was known to the defendant at the time of the preliminary hearing January 21, 1964. No objection was made to the evidence, nor was there any indication of a contention that there had been an illegal search. Neither then nor at the trial was there any motion to suppress.[4] On the contrary, during the trial the defendant's counsel in his questioning continually referred to these exhibits. Particularly, he cross-examined Marshal Nielson at great length in an attempt to show that they had no connection with the crime. Fairness requires that if he disputed the competency of the evidence he should make his objection at the earliest reasonable opportunity.[5] He should not be permitted to wait until the questioned evidence was before the jury and attempt to make use of it, then claim that it was not admissible.[6] Inasmuch as he chose to conduct his examination upon the basis of this evidence,[7] before he stated his objection to it he should be deemed to have waived any such objection.[8]

For the reasons we have discussed, that there was no unlawful search, and even if there had been there was no timely objection made to the evidence in question, the defendant's attack upon his conviction is rejected, and it is affirmed.

HENRIOD, C. J., and McDONOUGH, WADE and CALLISTER, JJ., concur.

2. United States v. Rees, 193 F.Supp. 849, 854 (D.Md.1961), and authorities cited thereat; c. f. United States v. Roberts, 179 F.Supp. 478, 479 (D.C.D.C.1959).

3. State v. Bryan, 16 Utah 2d 47, 395 P.2d 539, 540 (1964); see Zap. v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

4. See Fed.R.Crim.P. 41 (e); Annot., 50 A.L.R.2d 583–591 (1956).

5. See discussion of this point in the dissenting opinion in Henry v. State of Mississippi 379, U.S. ——, ——, n. 2, 85 S.Ct. 564, 575, n. 2, 13 L.Ed.2d 408 (1965).

6. See id., 379 U.S. ——, ——, main opinion 85 S.Ct. 564, 569 (1965).

7. See id., 379 U.S. ——, ——, n. 7, 85 S.Ct. 564, 569 n. 7 (1965).

8. See State v. Botha, 27 Utah 289, 295–296, 75 P. 731 (1904); State v. Mortensen, 26 Utah 312, 349–350, 73 P. 562, 633 (1903); Rank v. State, 373 P.2d 734, 735–736 (Alaska 1962); State v. Bass, 242 S.C. 193, 130 S.E.2d 481, 483 (1963); see generally 23A C.J.S. Criminal Law § 1077, p. 60, n. 28 (1961).