The STATE of Utah, Plaintiff and Respondent,

v.

Stewart Michael KELSEY, Defendant and Appellant.

No. 13376.

Supreme Court of Utah.

Feb. 28, 1975.

Elaine D. Larsen, Meredith, Barber & Day, Salt Lake City, for defendant and appellant.

Vernon B. Romney, Atty. Gen., M. Reid Russell, Earl F. Dorius, Asst. Attys. Gen., Salt Lake City, for plaintiff and respondent.

CROCKETT, Justice:

The defendant, Stewart Michael Kelsey, was convicted of the crime of murder in the second degree for beating to death Raymond Douglas Eagle, a 3½-year-old child, left in his care at defendant's mother's home near Eighth West and Second North in Salt Lake City on the afternoon of November 27, 1972. Prior to his trial he underwent psychiatric evaluation which resulted in the report that he was competent; and that he was able to stand trial and assist in his defense. The defendant and his counsel made the request that, even though the charge was first-degree murder, he be permitted to waive a jury and be tried by the court. Upon such trial, the court found him guilty of second-degree murder and he appeals.

In attempting to reverse his conviction defendant alleges error: (1) in accepting his waiver of a trial by jury; (2) admitting evidence concerning a statement he made to police which he avers was not given voluntarily with a knowledge of his rights to remain silent and to have counsel at that time; (3) receiving evidence which was obtained by an unlawful search of his residence; (4) that the evidence does not support a finding of second-degree murder; and (5) that the judgment is invalid and without proper support since findings of fact and conclusions of law were not made by the judge who heard the evidence.

The little boy Raymond was left to play in the backyard of defendant's mother's home on the afternoon referred to. Defendant, a man 19 years of age, who resided there with his mother, was left in charge when his mother left about 1:30 in the afternoon. The defendant had been living with Raymond's mother as a paramour until the previous week. It is not contended otherwise than that during the afternoon he became provoked at the child and over a continued period of time severely beat him. When the defendant's mother arrived home at about 5:00 p. m. and discovered the condition of the little boy, she took him, along with the defendant and her younger son Kelly to the University Hospital.

The trial and the review of cases like this, where some brutal adult has beaten a little child to an agonizing death, is among the most heart-sickening experiences which the courts are ever called upon to perform. It is difficult indeed, but nevertheless in accordance with our duty, to be as dispassionate and objective as possible in according his legal right to one accused of such a crime. Repugnant though it may be, it is necessary to recite briefly the condition of the child. The evidence is that on the way to the hospital he was gasping for breath. The doctors found that he had severe abrasions, and bruises around the face, eyes, mouth and ears. The abdomen was distended indicating rupture of the internal organs; and when it was surgically opened in an effort to save the child's life there was found to be bleeding therein, apparently from rupture of the liver, and the child expired. The physicians gave the cause of death as a multiplicity of internal injuries.

Police, called by the hospital to investigate, took the defendant and Kelly to the

police station. After preliminary questioning and informing the defendant of his constitutional rights, the police secured a statement from him about events during the period the child was beaten. Then, accompanied by the defendant, the police went to the family home. They got his mother's consent to make a search; and in the bedroom found a belt and a plastic bottle which it appeared the defendant had used to beat the child.

The report of the psychiatric examination was that the defendant was of normal intelligence, though in the lower or "dull normal" range thereof. Further medical evidence was that the defendant conformed to a not unfamiliar pattern of antisocial violent behavior. That is, where a paramour lives with the mother of a child, not his own, he may tend to have resentment and jealousy of the child and express it in violence upon the child; and that defendant's relationship with the mother of this child and the child fitted into his category.

 Defendant's contention that the court erred in granting his request to be tried without a jury is based on Section 77–27–2, U.C.A.1953:

> In all cases except where a sentence of death may be imposed, the trial by jury may be waived by the defendant.

There are several observations pertinent to this contention. A preliminary one is that neither the section quoted, nor any other provision of our law, states affirmatively that there *must* be a trial by jury in a first-degree murder case. That statute simply says that it *may* be waived in *other* cases. Yet it must be conceded that it does not expressly permit waiving of a jury in a death penalty case. But there are other considerations of greater importance.

The first of these is that a trial by jury is a right to be claimed, and not a burden

to be borne. A right is something which is to one's benefit or advantage. That which is termed a "right," which may be asserted or relied upon for one's advantage should be distinguished from that which is a duty or a burden, which one is compelled to bear.[1] It may well be that for any of a variety of reasons, or a combination of them, a man would rather be tried by a judge than by a jury. If that be so, and he so deliberately choose, we can see no reason why a jury should be forced upon him under a pretension that it is "right." One would think that a sense of common decency and the most elemental principles of justice should preclude an accused from asking the court to take an action in his behalf, then after he is convicted, complain that the court should not have granted his request, and that it erred in doing so.[2] It is almost amazing that anyone could indulge in such shifty tactics in the guise of asking for justice. Perhaps we should not be surprised at anything in these days when there has come to be so much distortion of concepts of justice in criminal proceedings. But this court has no desire nor intention to give its approval to such duplicity.[3] The defendant made his choice, and with it he must abide.

We make this further observation: While this court firmly believes that, until and unless the law is changed by our legislature, it is our duty to recognize and apply it as declared by our constitution and statutes. But the trial court was justified in believing that, looking at the matter realistically, because of the effect of the intervention of others, there was in fact no such thing as a death penalty offense;[4] and that there was ample reason why he could accept the waiver of a jury.

Another matter worthy of note bearing on this problem is that the defendant did not move for a new trial and raise this is-

---

1. See definition of "right," 77 C.J.S. p. 390.

2. We recognize the able and arduous efforts of defendant's counsel on appeal and note that different counsel of similar dedication represented him at trial.

3. As to invited error, see State v. Fair, 28 Utah 2d 242, 501 P.2d 107.

4. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

sue in the lower court. Our rule is that we will not review such a claim of error, except in some unusual exigency where it is necessary to do so to rectify a manifest injustice.[5]

The conclusion that for the foregoing reasons the trial court did not commit error, nor work any injustice upon this defendant in accepting his waiver of a jury is supported by the recent decisions of this court of State v. Maguire[6] and State v. Ainslie.[7] In harmony therewith, we reaffirm our opinion that the provisions of our law assuring trial by a jury are for the benefit of the accused, which he may waive if he so desires.[8]

Defendant's second contention is that he did not knowingly and voluntarily waive his right to remain silent and have counsel during police questioning and that the court erred in denying his motion to suppress that evidence. At the police station the officers first asked the younger brother, Kelly, about the occurrences. Then there was some questioning of the defendant; and when they realized how he was involved in the way the little child had met his death, Officer Jerry Campbell gave him a "Miranda warning."[9] We note here that the trial court excluded the statements made before the warning was given. The evidence concerning the subsequent questioning shows clearly that the defendant understood the protections he was entitled to, including his right to counsel, and that he voluntarily answered the questions. The averment now made that he did not, represents his own version of the facts, and not that adopted by the trial court, whose prerogative it was to make that determination.[10]

Defendant's claim that the inspection of the home and his room was an unlawful search deserves but summary treatment.[11] Defendant had returned to his own mother's home only the week before. Notwithstanding there had been discussion that he would make some contribution to the rent, it was his mother who was responsible for its payment. He lived there simply as a family member, where he slept in a room with his two younger brothers. His mother willingly agreed to the police officer's request to search the house. She testified that she knew she could refuse to consent to the search, and that she gave her consent because she desired to be a law abiding citizen. The trial court correctly ruled that the search was not an unreasonable one and that the evidence was admissible.[12]

Defendant's argument that the evidence does not justify a finding of second-degree murder focuses upon the requirement of malice aforethought. Section 76-30-1, U.C.A.1953, is a codification of the common law definition of murder. It provides that "Murder is the unlawful killing of a human with malice aforethought." Section 76-30-3 provides that murder, absent premeditation, is second-degree murder. Section 76-30-2 defines malice:

> Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take the life of a fellow creature. It is implied when no considerable provocation appears, or when *the circumstances*

5. State v. Cobo, 90 Utah 89, 60 P.2d 952; State v. Trusty, 28 Utah 2d 317, 502 P.2d 113; and see also Rule 51, U.R.C.P.

6. Utah, 529 P.2d 421.

7. Utah, 531 P.2d 864 (1975).

8. We say this in awareness of statements sometimes made, but with which we do not agree, that a waiver of a jury goes to the jurisdiction of the court; see Commonwealth v. Rowe, 257 Mass. 172, 153 N.E. 537.

9. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

10. See State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726.

11. Defendant cites Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856.

12. As to the right of a homeowner to consent to search of her home, see State v. Tuttle, 16 Utah 2d 288, 399 P.2d 580, and authorities cited therein, including Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477.

*attending the killing show an abandoned and malignant heart.*

In construing the language of these statutes, this court has held that:[13]

> "Malice aforethought" is a state of mind. The "aforethought" is the giving thought beforehand to malicious feeling or desires. . . . Thus when murder is defined as the unlawful killing of a human being with malice aforethought, it is the unlawful killing of a human being after giving thought beforehand to the desire to kill, *or* to cause great bodily injury or *to do an act knowing that its reasonable and natural consequence would be death or great bodily injury.*

Persons bent on crime do not usually invite spectators. In the absence of direct testimony, or declarations made by the accused, his state of mind is often difficult to prove. But a perfectly legitimate and practical way is to indulge whatever deductions and inferences reasonably follow from what actually happened. There can be no question that from what occurred in the beating of this little child and his resulting death the judge could conclude that "the circumstances attending the killing show an abandoned and malignant heart"; and that it was done with a "desire to kill," or to do acts knowing that the "reasonable and natural consequences would be death or great bodily injury." This, as indicated above, is sufficient to satisfy the malice aforethought requirement of second-degree murder.

■■ The trial court is presumed to know the law; and it is plainly apparent from the statements after the presentation of the evidence that he had in mind and gave careful consideration to the questions involved here. He stated into the record:

> The parties having rested and submitted final argument, this is my ruling: I find that the defendant, Stewart Michael Kelsey, is guilty of the crime of murder in the second degree. The testimony of two of Utah's most distinguished medical doctors, one a psychiatrist, and one a forensic pathologist, coupled with other corroborating testimony, demonstrated that the defendant had a diminished ability to control himself in the commission of this crime, and, therefore, *the elements of murder in the first degree beyond those requisite for murder in the second degree were not proved by the state beyond a reasonable doubt. I do find, however, that the state has proved each and every element of the crime of murder in the second degree beyond a reasonable doubt.*

The final point raised by the defendant is that the findings of fact and the trial and proceedings upon which his conviction rests were incomplete because the judge who tried the case, Frank Wilkins, did not enter the findings of fact and conclusions of law, but this was done by a successor judge. The statement by the judge quoted above clearly placed in the record his verdict and judgment. In addition to the foregoing, Judge Wilkins prepared and signed a final judgment and sentence of the defendant, and the order of commitment to the State Prison. However, he resigned before written findings of fact and conclusions of law were made and placed in the file. While this is not required in a criminal case, it was subsequently done by Judge Ernest F. Baldwin.

■■ As to the authority of the latter to perform that duty, Rule 63(a), U.R.C.P., provides:

> If by reason of death, sickness, *or other disability* a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules *after a verdict is returned* or findings of fact and conclusions of law are filed, *then any other judge* regularly sitting in or assigned to the court in which the action was tried *may perform those duties*; but if such judge is satisfied he cannot perform those duties because he did not preside

---

13. State v. Trujillo, 117 Utah 237, 214 P.2d 626.

at the trial or for any other reason, he may in his discretion grant a new trial. It is plainly apparent from the generality of the phrase "or other disability" that the rule is not limited to mere mental or physical disability, but extends to any disability whatsoever, including resignation of the judge.[14] Inasmuch as the stated findings and verdict of Judge Wilkins at the conclusion of the trial were sufficient to meet the requirements of Rule 52, U.R.C.P., there can be no question about the authority or propriety of the successor judge to make and sign formal findings of fact and conclusions of law which were consistent with the findings and verdict of the judge who actually tried the case.[15]

Affirmed. No costs awarded. (All emphasis added.)

ELLETT and TUCKETT, JJ., concur.

HENRIOD, Chief Justice (concurring):

I have to concur in the result of the main opinion, since the question of the death penalty is not before us as it was in State v. Winkle, Utah, 528 P.2d 467 (1974). I am still of the opinion, however, that the death penalty is available in Utah, in spite of,—and strangely enough,—because of Furman v. Georgia.[1] If ever the death penalty were justified, it would seem to be applicable here, where a little child was murdered by someone declared to have been competent, subject to McNaghten's case,[2] which this Court and most everyone else have considered to be the test of vulnerability for prosecution in the taking of a human's life,—magnified in this case by the death of a baby who could not fight back.

No one can bring back the life of this baby nor condole with reverence for legal or human rights, where none exists,—no how!

The implication by my learned colleagues, Crockett and Maughan, that there is no death penalty in Utah because of the Furman case, in my opinion is quite erroneous. It certainly cannot be cited as the law or rule of this case, since no one raised the issue on appeal,—and such implication, anyway is premature since the Winkle case mentioned above, is still pending in this Court, because a petition for rehearing of that case has been granted.

MAUGHAN, Justice (concurring):

With the main opinion, I concur; and agree that the trial court was justified in believing there to be no death penalty, (for the reason therein stated), thus, accepting defendant's election to waive a jury and be tried for murder in the second degree. Defendant was tried and convicted prior to the enactment of the Utah Criminal Code, effective July 1, 1973.

However, I am constrained to observe that defendant was represented at trial by one appointed counsel and on this appeal by another appointed counsel—both of whom appear to have done well. I, respectfully, advance the view that counsel on appeal could, rightly, believe that Sections 77-27-2 and 76-30-4 were designed by the legislature to have meaning and, if they were, to have such surveyed by this court. Rather, than denigrate such effort, it seems such should be recognized as industry in giving a person the defense to which he is entitled—a quality to be encouraged.

14. McIntyre v. Modern Woodmen of America, 200 F. 1 (CCA 6th, 1912); see also 7 Moore's Federal Practice, para. 63.03.

15. Makah Indian Tribe v. Moore, 93 F.Supp. 105 (W.D.Wash.1950), rev'd on other grounds sub nom. Makah Indian Tribe v. Schoettler, 192 F.2d 224 (CA 9th, 1951).

1. 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 346 (1972).

2. 10 Clark & F. 200; State v. Kirkham, 7 Utah 2d 108, 319 P.2d 859 (1958).