# CLYDE MATTOX v. UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 1008. Submitted October 31, 1892. — Decided November 14, 1892.

When the trial court excludes affidavits offered in support of a motion for a new trial, and due exception is taken, and that court, in passing upon the motion exercises no discretion in respect of the matters stated in the affidavits, the question of the admissibility of the affidavits is preserved for the consideration of this court on a writ of error, notwithstanding the general rule that the allowance or refusal of a new trial rests in the sound discretion of the court to which the application is addressed.

In determining what may or may not be established by the testimony of jurors to set aside a verdict, public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow it; but evidence of an overt act, open to the knowledge of all the jury, may be so received.

*Perry* v. *Bailey*, 12 Kansas, 539, approved and followed.

On a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations is inadmissible either to impeach or support the verdict; but a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated on his mind; and he may also testify in denial or explanation of acts or declarations outside of the jury room, where evidence of such acts has been given as ground for a new trial.

*Woodward* v. *Leavitt*, 107 Mass. 453, approved and followed.

The jury in this case, (an indictment for murder,) retired October 7, to consider their verdict. On the morning of October 8, they had not agreed on their verdict. A newspaper article was then read to them, the tendency of which was injurious to the accused. They returned a verdict of guilty. Affidavits of jurors of this fact were offered in support of a motion for a new trial, and were rejected. *Held,* that this was reversible error.

Dying declarations are admissible on a trial for murder as to the fact of the homicide and the person by whom it was committed, in favor of the defendant.

In this case, a few hours after the commission of the act, and while the wounded man was perfectly conscious, the attending physician informed him that the chances were all against him, and that there was no show for him. He was then asked who did the shooting. He replied that he did

not know. The evidence of this was received without objection. Defendant's counsel then asked whether in addition to saying that he did not know who shot him, he did not say further that he knew the accused and knew that it was not he. This was objected to on the ground of incompetency, and the objection sustained. *Held*, that this was error.

THIS was an indictment charging Clyde Mattox with the murder of one John Mullen, about December 12, 1889, in that part of the Indian Territory made part of the United States judicial district of Kansas by section two of the act of Congress of January 6, 1883, (22 Stat. 400, c. 13,) entitled "An act to provide for holding a term of the District Court of the United States at Wichita, Kansas, and for other purposes."

Defendant pleaded not guilty, was put upon his trial, October 5, 1891, and on the eighth of that month was found guilty as charged, the jury having retired on the seventh to consider of their verdict. Motions for a new trial and in arrest of judgment were severally made and overruled, and Mattox sentenced to death. This writ of error was thereupon sued out.

The evidence tended to show that Mullen was shot in the evening between eight and nine o'clock, and that he died about one or two o'clock in the afternoon of the next day; that three shots were fired and three wounds inflicted; that neither of the wounds was necessarily fatal, but that the deceased died of pneumonia produced by one of them described as "in the upper lobe of the right lung, entering about two or three inches above the right nipple, passing through the upper lobe of the right lung, fracturing one end of the fourth rib, passing through and lodging beneath the skin on the right side beneath the shoulder blade." The attending physician, who was called a little after nine o'clock and remained with the wounded man until about one o'clock in the morning, and visited him again between eight and nine o'clock, testified that Mrs. Hatch, the mother of Clyde Mattox, was present at that visit; that he regarded Mullen's recovery as hopeless; that Mullen, being "perfectly conscious" and "in a normal condition as regards his mind," asked his opinion, and the doctor said to him: "The chances are all against you; I do not think

there is any show for you at all." The physician further testified, without objection, that, after he had informed Mullen as to his physical condition, he asked him as to who shot him, and he replied, "he didn't have any knowledge of who shot him. I interrogated him about three times in regard to that. — who did the shooting — and he didn't know." Counsel for defendant, after a colloquy with the court, propounded the following question: "Did or did not John Mullen, in your presence and at that time say in reply to a question of Mrs. Hatch, 'I know your son, Clyde Mattox, and he did not shoot me; I saw the parties who shot me and Clyde was not one of them.'" This question was objected to as incompetent, the objection sustained, and defendant excepted. Counsel also propounded to Mrs. Hatch this question: "Did or did not John Mullen say to you on the morning you visited him, and after Dr. Graham had told him that all the chances for life were against him, 'I know Clyde Mattox, your son, and he was not one of the parties who shot me?'" This was objected to on the ground of incompetency, the objection sustained, and defendant excepted.

In support of his motion for new trial the defendant offered the affidavits of two of the jurors that the bailiff who had charge of the jury in the case after the cause had been heard and submitted, "and while they were deliberating of their verdict," "in the presence and hearing of the jurors or a part of them, speaking of the case, said: 'After you fellows get through with this case it will be tried again down there. Thompson has poison in a bottle that them fellows tried to give him.' And at another time, in the presence and hearing of said jury or a part of them, referring to the defendant, Clyde Mattox said: 'This is the third fellow he has killed.'" The affidavit of another juror to the same effect in respect of the remark of the bailiff as to Thompson was also offered, and in addition, the affidavits of eight of the jurors, including the three just mentioned, "that after said cause had been submitted to the jury, and while the jury were deliberating of their verdict, and before they had agreed upon a verdict in the case, a certain newspaper printed and published in the city of

Wichita, Kansas, known as The Wichita Daily Eagle, of the date of Thursday morning, October 8, 1891, was introduced into the jury room ; that said paper contained a comment upon the case under consideration by said jury, and that said comment upon said case so under consideration by said jury, was read to the jury in their presence and hearing ; that the comment so read to said jury is found upon the fifth page of said paper, and in the third column of said page, and is as follows :

" ' *The Mattox case — The jury retired at noon yesterday and is still out.*

" ' The destiny of Clyde Mattox is now in the hands of the twelve citizens of Kansas composing the jury in this case. If he is not found guilty of murder he will be a lucky man, for the evidence against him was very strong, or at least appeared to be to an outsider. The case was given to the jury at noon yesterday, and it was expected that their deliberations would not last an hour before they would return a verdict. The hour passed and nine more of them with it, and still a verdict was not reached by 10.30 last night, when the jury adjourned and went to their rooms at the Carey. Col. Johnson, of Oklahoma City, defended him, and made an excellent speech in his behalf to the jury. Mr. Ady also made a fine speech and one that was full of argument and replete with the details of the crime committed as gathered from the statements of witnesses. The lawyers who were present and the court officers also agree that it was one of the best and most logical speeches Mr. Ady ever made in this court. It was so strong that the friends of Mattox gave up all hope of any result but conviction. Judge Riner's instructions to the jury were very clear and impartial, and required nearly half an hour for him to read them. When the jury filed out, Mattox seemed to be the most unconcerned man in the room. His mother was very pale and her face indicated that she had but very little hope. She is certainly deserving of a good deal of credit for she has stuck by her son, as only a mother can, through all his trials and difficulties, and this is not the first one by any

means, for Clyde has been tried for his life once before. He is a youthful-looking man of light build, a beardless face and a nervous disposition. The crime for which he has just been tried is the killing of a colored man in Oklahoma city over two years ago. Nobody saw him do the killing and the evidence against him is purely circumstantial, but very strong, it is claimed, by those who heard all the testimony.'"

The bill of exceptions states that these affidavits and a copy of the newspaper referred to " were offered in open court by the defendant in support of his motion for a new trial and by the said District Court excluded; to which ruling the defendant, by his counsel then and there excepts and still excepts." And the defendant excepted to the overruling of his motions for new trial and in arrest of judgment.

*Mr. J. W. Johnson* and *Mr. T. F. McMechan* for plaintiff in error.

*Mr. Assistant Attorney General Maury* for defendant in error.

I. The first assignment of error relates to the rejection of the prisoner's offer to prove a statement or declaration of the deceased, John Mullen, made shortly before his death.

For that purpose the defence called Dr. Samuel Graham, the physician who attended Mullen after the shooting. The witness said that he told the deceased " The chances are all against you; I don't think there is any show for you at all."

This was between 8 and 9 o'clock in the morning, and about 1 or 2 o'clock that day Mullen died. The witness then said that, after making the above statement, he interrogated Mullen about three times as to who shot him, and that he replied, " he didn't have any knowledge of who shot him."

The question that elicited this testimony was not objected to by the counsel for the government.

The counsel for the defence then asked the witness whether the deceased, after he had been told by the witness what his condition was, as above, made any statement to Mrs. Hatch

"as to who it was shot him, or as to what knowledge he had as to who shot him." To this question the counsel for the prosecution objected, stating, "It has not been proven that the party knew that death was impending." The question, as thus propounded, was objected to by the prosecution, and the objection was sustained by the court, and thereupon the defence excepted.

The offer to prove the alleged statement of the deceased to Mrs. Hatch, the mother of the accused, came from the defence, and it was incumbent on the party thus offering the evidence to show, satisfactorily, that it was admissible as a dying declaration and was not on the footing of mere hearsay. But Dr. Graham, the witness, was not asked whether the deceased had said or done anything that indicated that he regarded death as impending before or at the time the alleged declaration was made. Why some such question was not put, particularly after the remark of the court that counsel knew he had not laid a proper foundation for the evidence, and that the question was not what the doctor thought, but "what the man thought about it," is not readily perceived.

It is true that what the deceased said to the doctor about the shooting went in without objection, and without even the usual inquiries from the court as to the circumstances under which the statements were made, but that was no reason why some other and different conversation between the deceased and another person, Mrs. Hatch, should have been admitted, over the prosecution's objection.

The point we make is not that the deceased made no remark with reference to Dr. Graham's statement of his condition, but that he made no manifestation of any sort showing that he regarded himself as *in extremis*. The mere fact that the physician told the deceased that "the chances are all against you; I don't think there is any show for you at all," shows, as the court remarked, that the "doctor didn't have much hope," but does not show that the deceased was without hope. It is never safe to conclude in such cases that the declarant believed death impending because his physician told him so. See *Rex* v. *Reany*, 7 Cox, C. C. 209; *Woodcock's*

*Case*, 1 Leach, 500; *Van Butchell's Case*, 3 C. & P. 631; *Hill* v. *Commonwealth*, 2 Gratt. 594; *Donnelly* v. *State*, 2 Dutcher, (26 N. J. Law,) 463, 498, 499, a case in which the late Mr. Justice Bradley bore a prominent part; *Regina* v. *Bedingfield*, 14 Cox, C. C. 341; *Rex* v. *Spilsbury*, 7 C. & P. 187; *Rex* v. *Hayward*, 6 C. & P. 157; *Rex* v. *Mead*, 2 B. & C. 605, 608; *Regina* v. *Hind*, 8 Cox, C. C. 300; *Moore* v. *Alabama*, 12 Alabama, 764; *S. C.* 46 Am. Dec. 276; *Moeck* v. *People*, 100 Illinois, 242.

It would seem that these cases proceeded on a safe principle. To allow such evidence to be received would be a temptation to the unscrupulous to wring from the dying victim some statement favorable to his assailant. It would be a dangerous obstruction to the enforcement of criminal justice if those on trial for murder could shelter themselves behind such evidence.

But the question propounded to Mrs. Hatch was objectionable, also, because of its leading character, and properly ruled out on that ground alone.

II. The remaining assignments of error, except the eighth, may be grouped together and disposed of under one principle.

It will be observed that they are all founded on so much of the bill of exceptions as relates to the denial of the defendant's motion for a new trial and the several grounds thereof. But nothing is better settled than that the exercise of the trial judge's discretion in allowing or denying a motion for a new trial is not reviewable by this court by writ of error. This court says in *Newcomb* v. *Wood*, 97 U. S. 581, 583, 584: "It has long been the established law in the courts of the United States that to grant or refuse a new trial rests in the sound discretion of the court to which the motion is addressed, and that the result *cannot be made the subject of review upon a writ of error.*" See also *Insurance Co.* v. *Barton*, 13 Wall. 603.

A motion for a new trial, whatever be its technical merits, should never be allowed against the real justice of the case. It is because the determination of such a motion involves the exercise of a wide equitable discretion, and requires such an appreciation of the case as the judge before whom it was tried

can generally, alone possess, that the granting or denying of such a motion will not be reviewed by writ of error. A court of error could not, in many instances, be made to see the case as the trial judge saw it, and therefore could not, in such cases certainly, safely review his action. It follows, therefore, that the alleged misconduct of the bailiff and jury cannot be considered by this court.

It being clear that the judge below was not guilty of an abuse of discretion in denying the motion for a new trial, it is quite unnecessary to inquire whether the affidavits of the jurors rejected by the court were admissible. Should, however, that question be to be determined, the court will be glad to have a reference to the valuable opinion of the Supreme Court of Kansas, in the case of *Perry* v. *Bailey*, 12 Kansas, 539, delivered by Mr. Justice Brewer, then a judge of that court.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

The allowance or refusal of a new trial rests in the sound discretion of the court to which the application is addressed, and the result cannot be made the subject of review by writ of error, *Henderson* v. *Moore*, 5 Cranch, 11; *Newcomb* v. *Wood*, 97 U. S. 581; but in the case at bar the District Court excluded the affidavits, and, in passing upon the motion, did not exercise any discretion in respect of the matters stated therein. Due exception was taken and the question of admissibility thereby preserved.

It will be perceived that the jurors did not state what influence, if any, the communication of the bailiff and the reading of the newspaper had upon them, but confined their statements to what was said by the one and read from the other.

In *United States* v. *Reid*, 12 How. 361, 366, affidavits of two jurors were offered in evidence to establish the reading of a newspaper report of the evidence which had been given in the case under trial, but both deposed that it had no influence

on their verdict. Mr. Chief Justice Taney, delivering the opinion of the court, said: "The first branch of the second point presents the question whether the affidavits of jurors impeaching their verdict ought to be received. It would, perhaps, hardly be safe to lay down any general rule upon this subject. Unquestionably such evidence ought always to be received with great caution. But cases might arise in which it would be impossible to refuse them without violating the plainest principles of justice. It is, however, unnecessary to lay down any rule in this case, or examine the decisions referred to in the argument. Because we are of opinion that the facts proved by the jurors, if proved by unquestioned testimony, would be no ground for a new trial. There was nothing in the newspapers calculated to influence their decision, and both of them swear that these papers had not the slightest influence on their verdict." The opinion thus indicates that public policy which forbids the reception of the affidavits, depositions or sworn statements of jurors to impeach their verdicts, may in the interest of justice create an exception to its own rule, while, at the same time, the necessity of great caution in the use of such evidence is enforced.

There is, however, a recognized distinction between what may and what may not be established by the testimony of jurors to set aside a verdict.

This distinction is thus put by Mr. Justice Brewer, speaking for the Supreme Court of Kansas in *Perry* v. *Bailey*, 12 Kans. 539, 545: "Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven

may be heard. Under this view of the law the affidavits were properly received. They tended to prove something which did not essentially inhere in the verdict, an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one."

The subject was much considered by Mr. Justice Gray, then a member of the Supreme Judicial Court of Massachusetts, in *Woodward* v. *Leavitt,* 107 Mass. 453, where numerous authorities were referred to and applied, and the conclusions announced, " that on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. So a juryman may testify in denial or explanation of acts or declarations outside of the jury room, where evidence of such acts has been given as ground for a new trial." See, also, *Ritchie* v. *Holbrooke,* 7 S. & R. 458; *Chews* v. *Driver,* 1 Coxe (N. J.), 166; *Nelms* v. *Mississippi,* 13 Sm. & Marsh. 500; *Hawkins* v. *New Orleans Printing Co.,* 29 La. Ann. 134, 140; *Whitney* v. *Whitman,* 5 Mass. 405; *Hix* v. *Drury,* 5 Pick. 296.

We regard the rule thus laid down as conformable to right reason and sustained by the weight of authority. These affidavits were within the rule, and being material their exclusion constitutes reversible error. A brief examination will demonstrate their materiality.

It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiassed judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated. Hence, the separation of the jury in such a way as to expose them to tampering, may be reason for a new trial, variously held as absolute; or *prima facie,* and subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took

place.   Wharton Cr. Pl. and Pr. §§ 821, 823, 824, and cases cited.

Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless. their harmlessness is made to appear.

Indeed, it was held in *People* v. *Knapp*, 42 Michigan, 267, that the presence of an officer during the deliberations of the jury is such an irregular invasion of the right of trial by jury as to absolutely vitiate the verdict in all cases without regard to whether any improper influences were actually exerted over the jury or not.   And in *Kansas* v. *Snyder*, 20 Kansas, 306, where the bailiff, who had charge of the jury, had been introduced and examined as a witness on behalf of the State, and had testified to material facts against the accused, his presence in the jury room during the deliberations of the jury was held fatal to the verdict.

In *Gainey* v. *People*, 97 Illinois, 270, the Supreme Court of Illinois was of opinion that the presence of a bailiff, in charge of a jury in a capital case, in the jury room during a part of their deliberations, was a grave irregularity and a breach of duty on the part of the officer, which would or would not vitiate the verdict, depending upon the circumstances in each particular case, and the application of the rule in *Kansas* v. *Snyder*, was approved; but the conclusion reached in *People* v. *Knapp* was not fully sanctioned.   The text-books refer to many cases in which the action of the officer having a jury in charge, when prejudice might have resulted ; or unauthorized communications having a tendency to adverse influence; or the reading of newspapers containing imperfect reports of the trial, or objectionable matter in the form of editorial comments or otherwise, have been held fatal to verdicts.

The jury in the case before us retired to consider of their verdict on the 7th of October, and had not agreed on the morning of the 8th, when the newspaper article was read to them.   It is not open to reasonable doubt that the tendency of that article was injurious to the defendant.   Statements that the defendant had been tried for his life once before ;

that the evidence against him was claimed to be very strong by those who had heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict, could have no other tendency. Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion. We should, therefore, be compelled to reverse the judgment because the affidavits were not received and considered by the court; but another ground exists upon which we must not only do this, but direct a new trial to be granted.

Dying declarations are admissible on a trial for murder as to the fact of the homicide and the person by whom it was committed, in favor of the defendant as well as against him. 1 East P. C. 353; *Rex* v. *Scaife,* 1 Mood. & Rob. 551; *United States* v. *Taylor,* 4 Cranch, C. C. 338; *Moore* v. *Alabama,* 12 Alabama, 764; *Commonwealth* v. *Matthews,* 89 Kentucky, 287. But it must be shown by the party offering them in evidence that they were made under a sense of impending death. This may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him. The length of time elapsing between the making of the declaration and the death is one of the elements to be considered, although as stated by Mr. Greenleaf, "it is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible." 1 Greenleaf Ev. 15th ed. §§ 156, 157, 158; *State* v. *Wensell,* 98 Missouri, 137; *Commonwealth* v. *Haney,* 127 Mass. 455; *Kehoe* v. *Commonwealth,* 85 Penn. St. 127; *Swisher* v. *Commonwealth,* 26 Gratt. 963; *State* v. *Schmidt,* 73 Iowa, 469. In

*Regina* v. *Perkins,* 9 C. & P. 395, the deceased received a severe wound from a gun loaded with shot, of which wound he died at five o'clock the next morning. On the evening of the day on which he was wounded, he was told by a surgeon that he could not recover, made no reply, but appeared dejected. It was held by all the judges of England that a declaration made by him at that time was receivable in evidence on the trial of a person for killing him, as being a declaration *in articulo mortis.* There the declaration was against the accused, and obviously no more rigorous rule should be applied when it is in his favor. The point is to ascertain the state of the mind at the time the declarations were made. The admission of the testimony is justified upon the ground of necessity, and in view of the consideration that the certain expectation of almost immediate death will remove all temptation to falsehood, and enforce as strict adherence to the truth as the obligation of an oath could impose. But the evidence must be received with the utmost caution, and if the circumstances do not satisfactorily disclose that the awful and solemn situation in which he is placed is realized by the dying man because of the hope of recovery, it ought to be rejected. In this case the lapse of time was but a few hours; the wounds were three in number and one of them of great severity; the patient was perfectly conscious, and asked the attending physician his opinion, and was told that the chances were all against him, and that the physician thought there was no " show for you [him] at all." He was then interrogated as to who did the shooting, and he replied that he did not know. All this was admitted without objection. Defendant's counsel then endeavored to elicit from the witness whether, in addition to saying that he did not know the parties who shot him, Mullen stated that he knew Clyde Mattox, and that it was not Clyde who did so. The question propounded was objected to on the sole ground of incompetency, and the objection sustained. In this, as the case stood, there was error. So long as the evidence was in the case as to what Mullen said, defendant was entitled to refresh the memory of the witness in a proper manner and bring out, if he could, what more, if any-

thing, he said in that connection. It was not inconsistent with Mullen's statement that he did not know the parties, for him also to have said that he knew Mattox was not one of them. His ignorance of who shot him was not incompatible with knowledge of who did not shoot him. We regard the error thus committed as justifying the awarding of a new trial.

*The judgment is reversed, and the cause remanded to the District Court of the United States for the District of Kansas, with a direction to grant a new trial.*