**Melvin Davis REES, Jr., Plaintiff,**

v.

**C. C. PEYTON, etc., Defendant.**

**Civ. A. No. 2970–M.**

United States District Court
E. D. Virginia,
Alexandria Division.
Jan. 10, 1964.

S. White Rhyne, Jr., Washington, D.C., John J. Brandt, Arlington, Va., for plaintiff.

Reno S. Harp, III, Asst. Atty. Gen., Richmond, Va., for defendant.

LEWIS, District Judge.

Melvin Davis Rees, Jr., now confined in the Virginia State Penitentiary pursuant to a judgment and sentence of execution of the Circuit Court of Spotsylvania County, Virginia, seeks his release via a writ of habeas corpus on the ground that said judgment and sentence are illegal and in derogation of his civil rights, privileges and immunities

secured by the Constitution [1] of the United States. He grounds his claim upon the refusal of the Circuit Court of Spotsylvania County to order his transfer from the State Penitentiary at Richmond to the City Jail in Fredericksburg so that he could be near his court-appointed counsel; upon the refusal of the Circuit Court to grant him a change of venue or venire; and upon the admission in evidence, over his objection, of the .38 caliber pistol which was taken by unlawful search and seizure.

Rees raised the same federal constitutional questions herein asserted during his trial in Spotsylvania County and in his appeal to the Supreme Court of Appeals of Virginia. That Court affirmed the Circuit Court, and the Supreme Court of the United States denied certiorari.[2]

He prays for a plenary hearing, with leave to supplement the State record with additional evidence relative to his constitutional claims; and says, as a habeas corpus applicant he is entitled to a determination of these federal constitutional questions by this Court independent of the conclusion reached by the State court.[3]

The defendant Cunningham joins Rees in his request for a plenary hearing. He admits this Court has jurisdiction to hear and determine this matter [4] and prays that the complaint be dismissed.

The request for a plenary hearing was granted, and the transcript of the evidence in the Baltimore hearing [5] and the complete record in the Spotsylvania County trial [6] were made a part of the record in this proceeding. In addition, Rees presented numerous exhibits and several witnesses who were not presented before or heard by the State court.

### Refusal of State Court to Transfer Prisoner to Fredericksburg Jail

Rees, previous to his trial in Spotsylvania County for the murder of Carroll Vernon Jackson, Jr., had been convicted in the United States District Court for Maryland of kidnapping Mrs. Mildred Jackson and her infant daughter Susan. He had been sentenced to life imprisonment and was then in federal custody. By arrangement of comity between Virginia and the United States, the United States Marshal for this District produced Rees before the Circuit Court of Spotsylvania County for trial. This procedure was based upon sound precedent.[7]

"The trial court is given all the jurisdiction needed to try and hear him by the consent of the United States, which only insists on his being kept safely from escape or from danger under the eye and control of its officer. This arrangement of comity between the two governments works in no way to the prejudice of the prisoner or of either sovereignty." Ponzi v. Fessenden, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922).

The United States Marshal for this District was charged with the duty of protecting Rees and with preventing self-inflicted harm or escape during his trial in Spotsylvania County, Virginia. In discharging that duty he determined that it was necessary to use the facilities of the Virginia State Penitentiary [8]. (The Fredericksburg City Jail was not approved as a federal prison.)

The State trial judge made certain that Rees could confer privately with his counsel both during the preparation of the case and during the course of the trial. He arranged for private confer-

---

1. Fourth and Fourteenth Amendments.

2. 372 U.S. 964, 83 S.Ct. 1088, 10 L.Ed. 2d 128 (1963).

3. Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963); Brown v. Allen, 344 U.S. 443, 506, 73 S. Ct. 397, 445, 97 L.Ed. 469 (1953).

4. 28 U.S.C. §§ 2241 and 2254.

5. United States v. Rees, 193 F.Supp. 849.

6. Rees v. Commonwealth, 203 Va. 850, 127 S.E.2d 406.

7. Chapman v. Scott, 10 F.2d 690 (2nd Cir. 1926); Wilkinson v. Youell, 180 Va. 321, 23 S.E.2d 356.

8. The Richmond penitentiary is a little more than fifty miles from the Fredericksburg City Jail.

ences in Richmond if such should be necessary. Before trial the defendant was brought to the Spotsylvania Courthouse six times so that he might confer privately with his counsel for as long as desired. On a number of occasions the State judge recessed the trial in order that counsel might confer privately with the defendant. The United States Marshal offered to and did bring Rees to the Spotsylvania Courthouse as early in the morning as counsel requested, and kept him there after court in the afternoon as long as counsel wished to confer with him.

Defense counsel were furnished a copy of the transcript of the Baltimore hearing in which most of the witnesses had testified. Further, they were given a list of all of the witnesses the Commonwealth intended to call during the trial, and were given the opportunity of interviewing each of them privately.

At no time before or during the trial did counsel for the defendant ever state or infer that they were in any manner handicapped in their defense of Rees as a result of his being confined in the State Penitentiary each night.

One of them now, however, says he was handicapped in defending Rees as a result of the Richmond confinement, and cites an occasion late one Friday afternoon when the Commonwealth called a witness (unknown to the defense). This witness testified he saw Rees in Orange County (near the scene of the crime) on the day of the crime. It was vital to combat this damaging testimony, says defense counsel, and had the defendant been in the Fredericksburg City Jail instead of at Richmond, he could have conferred with him at any time during the night in order to establish that Rees was not in Orange County on the night in question. Instead he had to relay questions to Rees by telephone through the Marshal.

■ This inconvenience, standing alone, is not enough to prejudice the defendant in his right to a fair trial,

especially so when the record discloses that Rees was available on the Friday in question at the Spotsylvania Courthouse for private conference with his counsel as long as either desired. The record also discloses that Rees was present in the Spotsylvania Courthouse all day the following Monday for further consultations, if that were so desired. (This testimony was not presented to the jury until Tuesday morning.)

■ Rees has no constitutional right, while a federal prisoner, to designate the place of his incarceration. That responsibility rests with the Attorney General of the United States acting through the Bureau of Prisons. 18 U.S.C. § 4082. Keeping him in the State Penitentiary at night in no way prejudiced his right to a fair trial, and the Court so finds.

### Refusal of the State Court to Grant a Change of Venue or Venire

■ "The law [Virginia] presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed. Hence, in order to overcome this presumption the burden is upon the one requesting a change of venue to show clearly that there is such a widespread feeling of prejudice on the part of the citizens of the county as will be reasonably certain to prevent a fair and impartial trial." Farrow v. Commonwealth, 197 Va. 353, 89 S.E.2d 312 (1955).

The State trial judge found:[9]

" 'There was no evidence introduced of mass prejudice against the defendant, of mob action, or threat of such action. There was no evidence of inflammatory newspaper editorials or interviews, of provocative radio or television commentaries. There was no evidence that it was the predominant belief in the county that the defendant was guilty. There was no evidence that it was the predominant belief among the people of the county that the defend-

---

9. Rees v. Commonwealth, 203 Va. 850, 127 S.E.2d 406, 413.

ant could not receive a fair and an impartial trial.

  *   *   *   *   *   *

" 'Interest, agitation, and apprehension concerning the case had diminished over the intervening years. Moreover, the Jackson family were not residents of Spotsylvania County. They lived in Louisa County and there was no evidence to indicate that they were closely related or well known in Spotsylvania County. Nor was the defendant known in Spotsylvania County.

" 'Throughout the trial there was no indication of any hostility, prejudice, bias or mob action against the defendant. Often the small courtroom was not filled. * * * The majority of these spectators were women and they appeared to be present out of curiosity. There were no demonstrations of any kind against the defendant—either inside or outside the courtroom.' "

No evidence to the contrary was offered in this proceeding.

Seventy-five jurors were drawn and summoned. Several presented evidence of ill health and they were excused. A number of farmers qualified upon their voir dire examination but upon suggestion of defense counsel were excused. At the end of the first day the panel was exhausted, but nineteen veniremen had qualified under the examination of the court and the searching examination of defense counsel. Twenty-five additional jurors were summoned for attendance the next day and from these the panel of twenty was completed and four alternates were selected, all of whom were qualified jurors. All prospective jurors who had visited the scene and objected to the death penalty, or who had a fixed opinion as to the guilt or innocence of the defendant, were excused from jury service in this case.

The State judge concluded the jury as selected was free from exception and denied the defendant's motion for change of venue or venire. This Court, upon examination of the transcript of the examination of the jurors on their voir dire, reaches the same conclusion.

Without objecting to the inquiries which the State court made on voir dire, and without asserting bias, prejudice or misconduct on the part of the jury as selected, the defendant now says the repeated newspaper articles and radio and television broadcasts making reference to certain prejudicial evidence not admitted during his trial created such an external influence upon the jury as to deny Rees a fair trial.

To substantiate this contention the defendant introduced in evidence photostatic copies of all of the newspaper articles published by the *Washington Post*, the *Richmond Times-Dispatch* and the *Fredericksburg Free Lance-Star* touching on this subject, and all of the "news scripts" broadcast by Radio Station WRVA and Television Stations WRC, WTOP and WTVR. He subpoenaed all of the members of the jury and attempted to ask each of them whether they had read or heard of any of these newspaper articles or broadcasts, and, if so, which ones and what parts thereof they now remembered.

The purpose of these questions was to show by inference that the jury had previously heard or read about this prejudicial evidence; hence they were unable to render a free and unbiased judgment.

An examination of these newspaper articles and radio and television transcripts clearly shows that considerable news coverage was given to Rees' Baltimore trial, especially so in the Washington and Richmond newspapers—that Rees was convicted of kidnapping—that Rees had made a handwritten account of the last hours of Mrs. Jackson and her daughter—that numerous articles, including newspaper pictures of the Jackson family, were found during the search of Rees' parents' home in Hyattsville, Maryland. There was no newspaper or television station located in Spotsylvania County. This pre-trial publicity origi-

nated in Washington, D. C., and in Richmond and Fredericksburg, Virginia.

■ It is no doubt true, however, that some or all of the jurors who sat in judgment of Rees read or heard some of this pre-trial publicity, but that is not the determinative question.

> " 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155 [25 L.Ed. 244].
>
> \* \* \* \* \*
>
> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. [People of State of] Illinois, 123 U.S. 131 [8 S.Ct. 21, 31 L.Ed. 80]; Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; Reynolds v. United States, supra." Irvin v. Dowd, 366 U.S. 717, 722, 723, 81 S.Ct. 1639, 1642, 1643, 6 L.Ed.2d 751 (1961).

■■ And the defendant cannot, after the verdict, show an alleged external influence upon the jury by subjecting the individual jurors to a post-conviction examination.

> " \* \* \* 'the testimony of jurors should not be received to show matters which essentially inhere in the verdict itself.' Hyde v. U. S., 225 U. S. 347, 384, 32 S.Ct. 793, 808, 56 L.Ed. 1114; Rakes v. U. S., 4 Cir., 169 F.2d 739, 745." Hawkins v. United States, 244 F.2d 854, 856 (4th Cir. 1957).

The cases cited by the defendant in support of his right to question the jury in re this pre-trial publicity, with the exception of one, refer to events occurring during the trial.

In Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the prejudicial publicity relied upon was a newspaper article injurious to the defendant, read to the jury during its deliberations. Near v. Cunningham, 313 F.2d 929 (4th Cir. 1963), refers to specific misconduct of a juror and the commingling of the jury with the spectators on the courthouse lawn during trial recesses. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), refers to a prejudicial newspaper article gotten to the jury during the trial. Holmes v. United States, 284 F.2d 716 (4th Cir. 1960), refers to prejudicial information gotten before the jury through an improper statement made by a court official during the progress of the trial.

The facts in Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L. Ed.2d 663 (1963), are readily distinguishable from the facts here. There:

> " \* \* \* the people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute. \* \* \* 'Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death.' "

In Thompson v. Commonwealth, 193 Va. 704, 70 S.E.2d 284 (1952), a prospective juror, while being examined on his voir dire, disclosed that he had known

the defendant for twenty-five years or more, and that several years prior to the date of the trial the defendant had stolen his automobile and seriously damaged it. He was convicted for the theft but had not paid for the damage to the automobile. This juror was then accepted and later excused for cause. In the interim he was allowed to go into the jury room where he discussed the car theft and conviction with the fifteen jurors who had been selected to sit on the trial jury.

██ The "external influence" here claimed was at best remote. There was no direct evidence of prejudice. The defendant seeks to establish by inference that which he could not do by direction. Rees was entitled to a fair trial by a panel of impartial jurors. That he had, and the Court so finds.

### Admission in Evidence of Pistol Obtained by Unlawful Search and Seizure

The defendant claims the .38 caliber pistol introduced in evidence over his objection was obtained by unlawful search and seizure in contravention of the Fourth Amendment of the Constitution of the United States.

This revolver was first introduced in Rees' trial in the United States District Court for Maryland on the charge of kidnapping Mrs. Jackson and her daughter Susan. A motion there was made for release of property and to suppress evidence. Chief Judge Roszel C. Thomsen of that Court made extensive findings of fact and concluded the search was not unreasonable and the agents (Federal Bureau of Investigation) were entitled to seize the revolver. His findings of fact and conclusions of law are reported in United States v. Rees, 193 F.Supp. 849. They are incorporated herein by reference.

Judge John D. Butzner, Jr., then the presiding State court judge, carefully reviewed this question in considering the defendant's motion to exclude evidence which was obtained by agents of the Federal Bureau of Investigation in a search of his parents' home. Judge Butzner found:[10]

" ' *  *  * the home which the agents searched was the home of Mr. and Mrs. Melvin Davis Rees, Sr., and not the home of the defendant.

" 'The Court further finds that the consent to the search was freely and intelligently given by both Mr. and Mrs. Melvin Davis Rees, Sr. There was no actual or implied coercion. The agents practiced neither trickery nor fraud.

" 'The accordian case which was found in the attic was in the possession of Mr. Melvin Davis Rees, Sr. The Court finds that he did not claim either the case or the gun were his son's. *  *  * His consent to have it opened was freely given. *  *  * He consented to the removal of the case and its contents after he had an opportunity to inspect them. *  *  *

" 'The Court finds that the search was not exploratory. The search was not broader than the consent which authorized it. The agents were looking for specific objects connected with the Jackson crime including the gun they found in the case. *  *  *' "

Judge Butzner's more detailed findings and conclusions of law are reported in Rees v. Commonwealth, 127 S.E.2d 406. They are incorporated herein by reference.

This Court, in addition to reviewing the transcripts of the evidence taken in the Baltimore and Spotsylvania trials, heard the testimony of Mr. and Mrs. Melvin D. Rees, Sr., F.B.I. Agents Francis X. Jahn and Bert C. Mereness, Ora T. Ordwein and Ethel Sullivan. The latter two were neighbors of the senior Reeses and were not called as witnesses in either of the two previous hearings.

10. Rees v. Commonwealth, 203 Va. 850, 127 S.E.2d 406, 416.

Mrs. Ordwein, in describing Mr. Rees, Sr. when he first met the F.B.I. agents at her home on January 24, 1960, said:

"[When] I came back in [the room] * * * Mr. Rees was standing, supported on either side by his elbows, by both of the FBI men, one on one side and one on the other, and he was as white as a sheet." (Tr. 35)

She was not in the Rees home while the F.B.I. agents were there on January 24th. She knew nothing about the consent or search and seizure.

Mrs. Sullivan was called to corroborate Mrs. Ordwein and only knew what Mrs. Ordwein had told her.

The testimony of Mr. and Mrs. Rees, Sr. and the F.B.I. agents is not materially different from that given in the Baltimore and Spotsylvania hearings.

■ This Court now finds that the search of the Melvin Davis Rees, Sr. home in Hyattsville, Maryland, on January 24, 1960, was made by agents of the Federal Bureau of Investigation with the express consent of Mr. and Mrs. Melvin Davis Rees, Sr., voluntarily given. The agents were looking for specific objects connected with the Jackson crime, including the .38 caliber pistol they found in the accordion case. This case was found in the third floor crawl space of the Rees home. Mr. Rees, Sr. freely gave his consent to have it opened and consented to the removal of the case and its contents after he had an opportunity to inspect them. He at no time claimed either the case or the gun were his son's.

The home searched was not the home of Melvin Davis Rees, Jr. It was the home of his parents. He was welcome to come and go at will. He stored various articles in his father's house but did not tell, and his parents did not know, that he had placed the locked accordion case in the third floor crawl space. Melvin Davis Rees, Jr. admitted ownership of the case and its contents.

■ The .38 caliber pistol, being an instrumentality of the crime under investigation, was legally seized. It was properly admitted in evidence during the Spotsylvania County trial.

The numerous authorities cited by the defendant in support of his various motions have all been examined by the Court. Many of them are discussed in Judge Thomsen's and Judge Butzner's opinions. Further comment by this Court would be repetitious. Suffice it to say, they are not sufficient to warrant the relief the defendant seeks.

This Court is satisfied Melvin Davis Rees, Jr. received a fair and impartial trial in Spotsylvania County, Virginia, and that none of his constitutional rights was violated. His prayer for a writ of habeas corpus will be denied and his complaint dismissed.