Melvin Davis REES, Jr., Appellant,

v.

C. C. PEYTON, Superintendent of the
Virginia State Penitentiary,
Appellee.

No. 9410.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 5, 1964.

Decided Feb. 1, 1965.

ALBERT V. BRYAN, Circuit Judge:

By habeas corpus in the District Court Melvin Davis Rees, Jr. seasonably but unsuccessfully attacked, as unconstitutional, his trial, conviction and sentence of death in a Virginia court for the murder of Carroll Vernon Jackson, Jr. On his appeal we find no entrenchment upon his rights in the criminal trial. Nor do we see error in the conduct of the habeas corpus hearing. Discharge of the writ will be affirmed.

The incursions upon his fundamental privileges by the State, as charged by Rees, are (1) the admission in evidence of a pistol seized in an illegal search, (2) refusal of a change of venue or venire, and (3) imprisonment during trial in Richmond, 50 miles away, rather than in the jail of Fredericksburg, about 6 miles from the place of trial. Errors pointed at the District Court, beside the failure to declare the conviction a nullity, are its rulings at the hearing precluding interrogation of the trial jurors as to their impression by or indifference to publicity during the trial relating to the crime. Prior to the Virginia trial, appellant Rees had been convicted in the Federal District Court of Maryland for kidnapping of the murder victim's wife and sentenced to life imprisonment, with no appeal taken. See United States v. Rees, D.C., 193 F.Supp. 849 (1961).

A compendium of the facts will suffice to frame the legal issues now before us.[*] Carroll Vernon Jackson, Jr., the victim of the murder, with his wife, Mildred, and their two infant children, Susan and baby Janet, left his mother-in-law's home in Louisa County, Virginia during the late evening of January 11, 1959, driving to their own house in the same county, only a few miles distant. Next morning the car was found at a point midway to their destination, on the side of the highway and unoccupied. About

S. White Rhyne, Jr., Washington, D. C. (Charles A. Dukes, Jr., Green, Babcock & Dukes, Hyattsville, Md., and Mullin & Connor, Washington, D. C., on the brief), for appellant.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen. of Virginia, on the brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH, BOREMAN, BRYAN and BELL, Circuit Judges, sitting en banc.

---

[*] In addition to the opinion of District Judge Oren R. Lewis below, 225 F.Supp. 507, a careful narrative of the evidence is given by Chief Judge Roszel C. Thomsen in United States v. Rees, 193 F.Supp. 849 (D.Md.1961), and also is to be found in Rees v. Commonwealth, 203 Va. 850, 127 S.E.2d 406 (1962), refusing to review the conviction and adopting the opinion of Circuit Judge, now Federal District Judge, John D. Butzner, Jr., who presided at the trial.

two months later, March 4, the bodies of Carroll Jackson and the baby were found in adjoining Spotsylvania County. The infant had expired from head blows. Her father, severely beaten in like manner, had also been fatally shot through the head. The wound, in the opinion of the Medical Examiner of Virginia, came from a .38 caliber bullet. Near his body were his broken eyeglasses and a pair of plastic gun grips.

Afterwards, on March 21, 1959, the bodies of Mildred Jackson and her other daughter, Susan, were found buried in Maryland. Both had been cruelly clubbed about the head and apparently died from aspiration of blood.

Rees was arrested in West Memphis, Arkansas on June 24, 1960 by agents of the Federal Bureau of Investigation for unlawful flight to avoid prosecution for another murder in Maryland. His movements on the day of the Jackson tragedy had placed him in Spotsylvania County.

Upon notification of Rees' apprehension, FBI agents were sent to the home of his parents in Hyattsville, Maryland, not far from where the bodies of the wife and daughter had been unearthed. Rees was known to sleep at the house on occasion. The agents' purpose was to inform the parents of the arrest before news reporters reached them; to locate the Jackson murder pistol, to which it was believed the plastic grips belonged and with which it was thought the fatal blows had been dealt Carroll Vernon Jackson and his daughter; to obtain additional specified evidence connected with the Jackson and other homicides of which Rees was suspected; and to check his activities from time to time in the vicinity where his parents lived.

The revolver was found in their residence. The search there and the seizure of the pistol, resulting in its introduction in evidence, admittedly the decisive proof against Rees, constitute the primary and principal violation of constitutional immunities now pleaded by Rees.

■ I. The Fourth Amendment, applied to State prosecutions by the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was not transgressed. The search and seizure were not unreasonable, but in every sense reasonable and authorized in law. This conclusion rests on the facts; they demonstrate its soundness. Cf. Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1913); United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653 (1950). This becomes manifest upon continuation of the factual recital to include what occurred after the FBI agents arrived at the home of the Reeses.

Both of the parents consented to the search of the premises by the agents, the husband signing a formal authorization and the wife giving oral approval. But appellant Rees contends that this permission was vitiated through coercion of his parents. The first factor of the asserted duress is the timing of the visit on June 24, 1960, the very day of the arrest: that the agents should be the ones to carry the news to the parents and rely upon the mental shock to weaken their resistance to a search.

The agents reached the home about 3:30 o'clock in the afternoon. Finding no one there, they waited in a neighboring home. The father returning at four o'clock was invited by the neighbor into her house. She introduced him to the agents and left the room. They had already informed her of the arrest. When she entered the room again, she says, the senior Rees was shaken with emotion and was standing between the two agents for support. There is a difference of recollection here; the agents say they did not tell the father of his son's trouble until they were in his home.

The agents and the senior Rees left the house through the back door, to avoid the reporters who had gathered nearby, and went to the Rees home. Whether they then or had previously told him of what had happened, they here stated they wished to search his property and to ask him about the whereabouts of his son on certain days. In this he was requested to sign a form, prepared at the

time, stating his consent to the search. He preferred to consult his wife before making a decision. She came shortly. In the interval there is no indication of the agents' pressing their desire to search.

Upon hearing the distressing report, the wife readily acquiesced in the agents' proposal, observing that there was nothing to conceal. The father expressed the thought of consulting an attorney about the consent. The agents agreed that it was his right but said that as he felt his son could not have committed murder, there would be nothing found to incriminate him. Before it was signed both of the Reeses were fully aware of the contents of the paper. It read in this way:

"I, Melvin Davis Rees, Sr., having been informed of my Constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant, and of my right to refuse to consent to such a search, hereby authorize James W. Sibert and Thomas J. Fynee, Jr., Special Agents of the F.B.I., U.S. Department of Justice, to conduct a complete search in my residence located at 3908 Madison Street, Hyattsville, Maryland. These agents are authorized by me to take from my residence any letters, papers, materials, or other property which they may desire. This written permission is being given by me to the above named Special Agents, voluntarily and without threats or promises of any kind."

During the search pursuant to this permission the agents went into the attic. There they saw in the rear of a closet a removable section leading to a crawl space. In this area was found what is now designated as an accordion case. Its discovery was reported to the father and it was produced before him.

The case was locked with a padlock and hasp. A tag was attached bearing the name, address and telephone number of one Dennis J. Werber. When questioned about it, the father had no knowledge of its existence or ownership. Nor could he identify it as anything belonging to his son. He assented to its forcible opening. In it was found the pistol. The other contents were certain obscene drawings, including newspaper pictures of the Jacksons, and an account in the younger Rees' own handwriting of his killing of Mildred Jackson and daughter Susan, with the molestation of the former. Receipting for all the articles and with the Reeses' consent, the agents took the pistol and the papers to the FBI office. The revolver proved to be the gun which matched the plastic grips. Blood stains were revealed on the butt. Upon objection none of the *papers* was admitted in evidence.

■ The circumstances of the agents' entry and search, we think, are a complete refutation of appellant's charges of *psychological compulsion of either of his parents.* Both the State and the Federal court have found that consent was understandingly and voluntarily accorded. Any question of a search warrant was thus waived, as is permissible. Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), vacated on another ground in 330 U.S. 800, 67 S.Ct. 854, 91 L.Ed. 1259 (1946). This finding is deeply anchored in the evidence. The elder Reeses were in exclusive possession of the house, with every right to authorize even its rummage. The testimony showed the house was not the home of the appellant, that he was merely an occasional visitor there, with no particular space assigned him for any purpose. Consequently, his concurrence in the search was unnecessary. These circumstances divorce this case from the category of Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921) and like precedents cited by appellant as illegalizing the search for want of consent.

■ Likewise, the facts themselves render impregnable the District Court's approval of the State court's sanction of the opening of the accordion case.

No tag or other indicium attributing its ownership to appellant Rees was apparent. It was hidden in a remote part of the house, put there by someone without the knowledge of even the owners and occupants of the property. True, it was locked and the appellant, it now turns out, had the key. But the case itself negated any ownership of the younger Rees. It was marked as the property of another, Werber—not only by name but address and telephone number—with whom the senior Reeses were unacquainted. It could well have been abandoned personalty which, of course, was seizable. Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Appellant's parents had joined in the wish of the agents to force the lock of the case. Certainly they were warranted in ascertaining the subject-matter of an unrecognizable case found secreted in their home. These facts quite plainly exclude this situation from that in each of the contra precedents urged by the appellant: Holzhey v. United States, 223 F.2d 823 (5 Cir. 1955) and United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951).

■ Once the case was legally opened, as we think it was, the pistol could be seized; it was suspect as an instrument of the crime. This was not a general hunt for evidence of any kind; it was a search for specific articles. Abel v. United States, 362 U.S. 217, 239, 80 S. Ct. 683 (1959); Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). To our mind, the entire search and seizure were altogether without legal infirmity. Roberts v. United States, 332 F.2d 892 (8 Cir. 1964). For this view, we also adopt the reasons noted by Judge Lewis in the hearing below, as well as those given by Judge Thomsen and Judge Butzner in their respective determinations at trial to admit the pistol. United States v. Rees, supra, 193 F.Supp. 849 and Rees v. Commonwealth, supra, 203 Va. 850, 127 S.E.2d 406.

■ II. Nor do we perceive fault in the denial of the venue or venire change moved at the criminal trial. Without doubt, there was publicity aplenty about the crime. It was, admittedly, disseminated throughout the county of trial by press, television and broadcast. But discriminate consideration will prove that it was not allowed to rob Rees of a fair trial.

The Jacksons disappeared, to repeat, on the night of January 11, 1959, their bodies discovered in March. The pistol and the indecent written material were not found in the accordion case until June 1960. The prosecution on the Federal indictment for kidnapping took place at Baltimore, Maryland in March 1961, more than two years after the crime. The notoriety of which Rees complains first emanated from that trial. So far as humanly possible, it was restrained by the District Judge there. Nevertheless, the testimony was propagated through all the news media. The trial in Virginia was not begun until September 1961. Here again, the trial judge confined the potentially injurious publicity as far as it was at all possible. Rees' written description of his Maryland crime—labelled "Death Diary" in the news—was never divulged in either trial.

A change of venue or venire in Virginia would have been of no aid whatsoever. Obviously, the same broadcasts and telecasts heard and seen in the county of trial would extend over the State generally. Press stories had nearly the same circulation everywhere in Virginia as they did in Spotsylvania County. Alert to protect the accused against the prejudice of an affected jury, the trial judge subjected the veniremen to a rigorous and scrupulously searching voir dire. Counsel participated in the prying. In its aim we think the court succeeded.

The finding of the criminal court that no veniremen were accepted who had a fixed opinion in the case is confirmed in our review of their inquisition. Of course, the exploration developed that they had heard and read of the crime. Scarcely any person in Virginia of jury fitness and stature could reasonably have been expected to be unaware of it. With patience and determination the trial

judge ascertained from each juror whether his was a mind open to an appreciation and appraisal of the testimony only as it came from the stand, and to base decision exclusively on the evidence adduced at trial. No more can be demanded by an accused. It was put with clarity in Irvin v. Dowd, 366 U.S. 717 at page 722, 81 S.Ct. 1639 at page 1642, 6 L.Ed.2d 751 (1961) by Justice Clark:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.
>
> \* \* \* "

While that decision declared the publicity destructive of due process, the present circumstances are not within its condemnation.

The Virginia trial was more than 2½ years beyond the day of the crime, and not until 15 months after the arrest. Attendance at the trial was sparse, the State circuit judge noted. His findings, adopted by the Court below, also noted: "There was no evidence introduced of mass prejudice against the defendant, of mob action, or threat of such action. There was no evidence of inflammatory newspaper editorials or interviews, of provocative radio or television commentaries. There was no evidence that it was the predominant belief in the county that the defendant was guilty \* \* \*.

Interest, agitation and apprehension concerning the case had diminished over the intervening years."

The defendant's insulation from unfairness in trial resulting from the wide pervasion of news of so startling crimes was, we conclude, constitutionally adequate.

■ III. Furthermore, no prejudice whatsoever was inflicted upon Rees through his incarceration, during trial, in Richmond instead of in a county or city jail closer to the trial courtroom. The accused was under two life sentences passed by the Federal court in Baltimore, he was in the custody of the Attorney General of the United States, although made available to the State for trial, and the Federal marshal considered only the Richmond penitentiary to afford the necessary security against escape. It was an approved institution for Federal prisoners. No deputy marshal was available at a nearer point for surveillance of Rees. The Circuit Judge particularly saw to it that Rees was made readily and conveniently accessible to his counsel at the trial courthouse, and elsewhere, at all reasonable times.

■■ IV. Post-trial examination of the jurors was sought and refused in the habeas corpus hearing. Acknowledging the impropriety of post-trial plumbing of a juryman's conscience and disavowing any intention to re-canvass the impartiality of the jurors, Rees asserts that he had the right to question them as to their knowledge before trial "of incriminating information" not admitted in evidence. The distinction is not sound. The "information" was that which was conveyed in the news. The judgment a juror expresses in the verdict is not subject to subsequent public sounding. Mattox v. United States, 146 U.S. 140, 148, 13 S. Ct. 50, 36 L.Ed. 917 (1892); Rakes v. United States, 169 F.2d 739, 745 (4 Cir. 1948), cert. denied, 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380. The District Judge punctiliously preserved the sanctity of this principle, one so vital to our trial procedures.

■ Of course, a juror may after verdict be queried as to information, whether documentary or oral in nature, introduced into the jury room but not put before them at trial. Similarly, the intrusion of a stranger, or the misconduct of a juror, during deliberations is open to such inquiry. Cf. Mattox v. United States, supra, but that is not the nature of the present complaint.

■ Particular exception is taken by the appellant to the Court's rejection of proffered testimony of a juror's neighbor to a conversation in the presence of the juror before he was summoned for jury service. The subject of the conversation was a repetition of a report that Rees, before the Jackson murder, had once forced the car of one June Tuozzo off the road and abducted and assaulted her. Upon refusal of the District Court to permit the examination of the witness in this respect, Rees requested to call the juror. This, too, was refused.

While we think the statement of the neighbor was admissible, its exclusion was not substantial error. The juror had been questioned extensively on voir dire, as already mentioned, and had vouched his ability to decide objectively. Just how long prior to his acceptance as a juror was the alleged discussion is not clear. Nothing indicates, however, that the juror concealed any such discussion from the Court. If actually he had overheard the reiteration of the accusation, he may simply have not recalled it at the time he was examined.

Furthermore, the Tuozzo event was public knowledge. Indeed, it is one of the items of publicity mentioned by Rees in asking for a venue or venire change. In the Maryland trial the incident was permitted in evidence. United States v. Rees, supra, 193 F.Supp. 849, 856. The Virginia trial court rejected it. Rees v. Commonwealth, supra, 203 Va. 850, 127 S.E.2d 406, 419. Our judgment is that in this the petitioner shows no prejudicial error at the habeas corpus hearing.

The order of the District Court is affirmed.

Affirmed.